UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE, | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO.:  20-4332 |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
|     Defendant. | § | |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT & JURY DEMAND**

Plaintiff, John Doe,[1] by and through his attorneys of record, and files this Original Verified Complaint against Defendant Texas A&M University, and would respectfully show the Court as follows:

### INTRODUCTION

1. Plaintiff John Doe brings this action to recover monetary damages as well as injunctive and declaratory relief, as well as all other appropriate relief.

2. This case arises out of the decision of Defendant Texas A&M University to impose disciplinary sanctions against Doe in violation of Plaintiff's Constitutional and federal statutory rights.

### PARTIES

3. Plaintiff John Doe ("John") is an undergraduate student at Texas A&M University and a member of the Corps of Cadets.

---

[1] John Doe is a pseudonym. John Doe has been substituted for Plaintiff's name for all causes of action brought through this Complaint, which would otherwise publish important privacy interests of all parties. Upon consultation with counsel for the Defendants, John will file a Motion to Proceed Under a Pseudonym.

    a.  John Doe is a Texas resident with a residence in Dallas, Texas. Doe has completed three years of coursework at A&M.

    b.  At all material times, John Doe resided within this judicial district, the Southern District of Texas, while attending Texas A&M University.

4.  Defendant Texas A&M University is a public university located within the Southern District of Texas.

    a.  The organization and control of Texas A&M University is vested in the Board of Regents of the Texas A&M University System.

    b.  Texas A&M University has a principal place of business at 400 Bizzell St. College Station, TX 77843.

    c.  The University may be served through its President, Michael K. Young, and/or the incoming Interim President, John Junkins.

## **JURISDICTION AND VENUE**

5.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise out of questions of Federal Constitutional law under the 14th Amendment.

6.  The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

7.  This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant university's principal place of business is within this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

*[continued on the following page]*

## FACTS

**A.  A&M's Sexual Misconduct Policy**

8.  Over the years, the Federal Government, through the Department of Education, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

9.  On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a "Dear Colleague" letter to colleges and universities, requiring that universities investigating complaints of sexual misconduct apply the lowest burden of proof – "more likely than not" or preponderance of the evidence.

10. That Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

11. In response to the above-referenced pressure, many schools treated all those accused of sexual misconduct with a presumption of guilt.

12. Despite recent regulatory reform implemented by the Department of Education, the presumption of guilt within university disciplinary processes for the accused remains ever present and the lowest evidentiary burden remains permissible when evaluating student's guilt or innocence.

13. Texas A&M University System implemented system-wide policies to comply with the new rules submitted by the Department of Education under Secretary DeVos. Those policies apply to Texas A&M University and will hereafter be cited as "A&M Rules."

14. The University utilizes broad language within its policies to ensure that more prohibited conduct than that contemplated under Title IX would be subject to university investigation and sanctions. More specifically, A&M's Sexual Misconduct Policy applies to any student or

university employee conduct that occurs on campus, during school-organized functions off campus, or anywhere else so long as the alleged conduct "creates a hostile environment for Students, Employees, or Third Parties, while on University grounds or other property owned or controlled by the University or in any University employment or education program or activity." *See* A&M Rule 08.01.01.M1 § 1.3(c), Exhibit 1 at p. 2.

15. Section 3 of A&M's Rule 08.01.01.M1 provides that "[t]he University's response to allegations of Prohibited Conduct will be 1) prompt and equitable; 2) intended to stop and prevent the recurrence of any harassment; and 3) intended to remedy its discriminatory effects, as appropriate." *See* Exhibit 1 at p. 5.

16. University rules define "Prohibited Conduct" to "include[] discrimination, harassment (including non-consensual sexual contact, sexual assault, sexual exploitation, dating abuse/violence, domestic abuse/violence, stalking, quid pro quo and hostile environment sexual harassment), complicity, and retaliation." *See* A&M Rule 08.01.01.M1, Exhibit 1 at p. 1.

17. A&M's Rule 08.01.01 provides further definitions detailing such Prohibited Conduct. In relevant part:

   a. Sexual assault is defined as "an offense that meets the definition of rape, fondling, incest, or statutory rape as used in the FBI's Uniform Crime Reporting program." *See* A&M's Rule 08.01.01, Exhibit 2 at p. 3 (citing 34 CRF 668.46(a), which defines rape as "[p]enetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.").

b. Consent is the "clear, voluntary and ongoing agreement to engage in a specific sexual act. Persons need not verbalize their consent to engage in a sexual act for there to be permission. Permission to engage in a sexual act may be indicated through physical actions rather than words. A person who was asleep or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made under duress or by threat, coercion, or force cannot give consent." *See* Exhibit 2 at p. 1-2.

c. University policy defines "incapacitated" as "a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decisions about consent to sexual activity and recognizing the consequences of their decision." *See* A&M's Rule 08.01.01, Exhibit 2 at p. 4.

d. Section 7.1 of A&M's Rule 08.01.01.M1.01 further provides that a "Respondent's voluntary intoxication is never an excuse for or a defense to Prohibited Conduct, and it does not diminish the Respondent's responsibility to determine that the other person has given consent and has the capacity to do so." *See* Exhibit 3 at p. 21.

18. University "[s]tudents found responsible for committing acts of sex-based violence and/or non-consensual sexual penetration of another person will be subject to a minimum sanction of a one-year suspension, in the absence of significant mitigating factors." *See* § 4.5.3 of A&M's Rule 08.01.01, Exhibit 2 at p. 12. The rules do not further elucidate what would constitute a "significant mitigating factor[]" in this context.

a. The above-referenced students "who are allowed to return to a member university after a suspension of one year or more will be ineligible to hold an office in any student organization, ineligible to represent the university in any way (including

intercollegiate athletics or other competitions, both on and off campus), and ineligible to receive an institutional scholarship, in the absence of significant mitigating factors." *See* § 4.5.5 of A&M's Rule 08.01.01, Exhibit 2 at p. 12-13.

19. Students found responsible and punished under the above-referenced policies may only raise the following issues on appeal: "(a) a procedural error or omission that significantly impacted the outcome; (b) new evidence, unknown or unavailable during the investigation, that could have significantly impacted the outcome; or (c) the appropriateness or severity of the sanctions." *See* § 4.6.1 of A&M's Rule 08.01.01, Exhibit 2 at p. 13.

20. Pursuant to § 1.4 of A&M's Rule 08.01.01.M1.01, "[i]f the Complainant or the Respondent appeals the DA's [Designated Authority's] decision, the Appellate Authority (AA) will review the Investigation Report, The DA's decision, the documentary evidence, and any other relevant information and render a written decision on the appeal." *See* Exhibit 3 at p. 2.

21. A number of provisions of the University's sexual misconduct policies raise significant due process and self-incrimination concerns, including:

a. A student is permitted to have an attorney present at the interview or hearing, but that attorney is largely forbidden from active participation therein.

b. In seeking to cross-examine an accuser or adverse witnesses, a student must first submit proposed questions for approval by the Hearing Officer. That Hearing Officer has the right to review, determine, and/or narrow which questions are permitted during the hearing. Similarly, a student may submit written questions for the investigator to pose to an accuser or adverse witnesses, but the investigator is not required to ask those questions.

**B.  Spring Break 2020**

22. On Friday, March 6, 2020, John traveled to Gruene, Texas with several of his "buddies" in the Corps for a weekend trip over Spring Break. This would be the first time many in the group had traveled without supervision. As a result, most of the group brought alcohol to Gruene with the express intention of drinking to excess over the course of that weekend. By all accounts, that is exactly what took place.

23. John was one of the last of the group to arrive in Gruene on Friday. When he arrived, it quickly became clear that other members of their group (who had arrived earlier) had begun drinking several hours earlier. John then began consuming large amounts of alcohol over a short period of time to "catch up" to his peers. As a result, John does not recall anything that took place after 9:00 p.m. that evening.

24. That Saturday morning upon awaking, John asked the group what, if anything, they could recall having occurred the night before. Because most of the group had been similarly intoxicated, no one could recall specifically what John did.

25. On Saturday afternoon, the group went into Gruene to explore and have a meal. The group stayed together throughout the afternoon, and, to John's knowledge, no one in the group was behaving unusually.

26. However, upon returning to the home where they were staying for the weekend, John noticed that one of the female "buddies" in the group, a longtime, close personal friend of his, was seemingly avoiding him. John thought this behavior strange given their prior closeness and asked to speak with her privately, but she refused. John, like many others in the group, drank to similar excess on Saturday night and cannot recall much of the events that took place thereafter.

27. Thereafter and unbeknownst to John at the time, she disclosed to two other members of the group that John had sexually assaulted her on Friday, alleging John took her into a bedroom alone, locked the door, professed to having a "crush" on her, began kissing her, and subsequently removed both of their pants and penetrated her from behind. She later expressed her opinion to the investigator that she could not have consented to the alleged activity because she had been drinking alcohol that night.

28. Both John and his accuser were in romantic relationships with others at the time the alleged incident took place. Prior to this alleged incident, John had never given the female student any indication that he desired anything more than a platonic friendship with her. Indeed, John was preparing to propose to his girlfriend and had planned to discuss the same with this female student, his close, platonic friend.

29. Over the course of that weekend trip, no one disclosed the accusations levied against John to him directly. Instead, John was merely advised that "something bad" happened between him and the female student on Friday night and that it would be reported up the chain of command through the Corps as a result. Importantly and allegedly based on previous training the students had received concerning the sexual misconduct policies at A&M, all of these students believed that any sexual activity occurring between intoxicated persons would be nonconsensual sexual assault (for which they would be required to report).

**C.  The Sexual Assault Complaints Filed with A&M**

30.  The female student referenced above first submitted a complaint against John with the University, but requested that no action be taken against him at that time.

31. The initial complaint resulted in CREI imposing a no-contact directive against John.

32. The letter containing the no contact directive indicated that the University would take no further action concerning the complaint at that time. In email correspondence to John, the Interim Deputy Title IX Coordinator provided limited notice to John concerning the complaint, writing: "The purpose of this email is to notify you that a complaint has been filed naming you as a party. At this time we will not be proceeding with an investigation, however we are issuing the attached No Contact Directive."

33. However, on April 28, 2020, the female student changed her mind (concerning "informal resolution" of her case) and formally filed a complaint against John with A&M's Department of Civil Rights and Equity Investigations ("CREI") within its Office of University Risk, Ethics, and Compliance.

34. Around this same time, and due to the level of John's intoxication on the night in question, John's case manager (as a mandatory reporter) submitted a complaint of sexual assault on John's behalf. It was John's understanding that the two complaints would be handled concurrently in the event that the parties did not pursue informal resolution. John did not learn until much later that his complaint was never formally submitted or filed and therefore would not be considered by the Hearing Officer at the final hearing.

35. John did not receive notice of the above-referenced complaint until May 14, 2020. At that time, CREI provided John with the following summary of the complaint: "On or around March 6, 2020 at a rental house in Gruene, Texas[,] the Respondent sexually assaulted the Complainant by penetrating her vagina with his penis without her consent."

36. Thereafter, the Complainant again changed her mind and agreed to an informal resolution of her complaint. However, less than a month later, the Complainant changed her mind again.

**D. A&M's Title IX Investigation**

37. As a result of the pandemic and its effect on the University at large, John's case suffered significant delays. Delays also resulted when the assigned investigator went on medical leave.

38. It was not until July 2020 that John attended an interview with A&M's Title IX investigator. Further details concerning the student's complaint were provided to John at that time.

39. The investigator first provided John with a draft of the Investigation Report on August 18, 2020, where she found that it was more likely than not that John had penetrated the Complainant with his penis without her consent on March 6, 2020.

40. The investigator did not reach any determination concerning consent, as that was the responsibility of the assigned Hearing Officer. Because the investigator did not reach any determination surrounding consent, it remained an open question. The investigator did, however, include various statements from the Complainant concerning this issue.

    a. As outlined in the draft report, the complainant told the investigator the following: "I wasn't able to process this because I was intoxicated. If I was not intoxicated I would not have wanted that to happen because he [John] has a girlfriend and I was about to start dating someone. I wasn't able to register what was going on. I wasn't able to stop it in that moment." The investigator further noted that the Complainant advised she was "not okay" with what had allegedly occurred between her and John on the night in question.

41. John subsequently submitted his response to the initial draft of that report by September 1, 2020.

42. The investigator's draft report contained information previously unknown to John. For example, the female student claimed that on the night in question, John had professed romantic interest in her. The investigator failed to question John about this so he instead addressed it in his response to the report.

    a. Interestingly, several witnesses, as well as the complainant herself, explained during their interviews with the investigator that they had previously shared concerns about another male in their group. According to the complainant and witnesses, that person previously professed his love for the complainant and made physical advances towards her to that effect. The complainant had already requested that the other members of their group ensure that this particular man would not be alone with her when they were in Gruene together. However, the investigator never interviewed that person and seemingly did not consider him an alternate suspect in this case. In response to the investigator's draft report, John "request[ed] that further investigation be performed regarding other possible perpetrators[.]"

    b. Based on the amount of alcohol John consumed on that night, the investigator estimated his blood alcohol content (BAC) level to be approximately 0.232, nearly double to that estimated for the Complainant (.14). John's high BAC level indicates that certain actions he was alleged to have taken that night were highly improbable. Because the investigator was not a medical doctor or expert, John requested that the investigator confer with such expert to obtain a better understanding of whether John would have been physiologically capable of acting as alleged based on his high BAC level. However, no such expert was consulted despite John's request.

43. While awaiting response from the investigator regarding the above-referenced requests, John received new correspondence from the University advising him that the complaint against him could also constitute a violation of Texas A&M University Student Rules concerning "conduct unbecoming a cadet." As outlined in that letter, "[a] cadet is guilty of 'conduct unbecoming a cadet' when his or her actions or conduct could be interpreted to be detrimental to the best interests of the individual cadet, other persons, the cadet's unit, the Corps of Cadets, or Texas A&M University." Thus, the Hearing Officer assigned to John's case and final hearing would be responsible for determining whether John had committed a sexual assault as well as whether that alleged conduct constitutes "conduct unbecoming a cadet."

44. The assigned investigator ultimately submitted her final draft of the investigation report to the Hearing Officer on September 28, 2020. Although the final draft added the parties' responses to the draft investigation report, the investigator did not perform any further investigation concerning alternate suspects, nor did she consult with a medical expert as John had previously requested.

45. However, approximately one week before the final hearing, John received email correspondence advising that "[t]he Hearing Officer, after reviewing the [investigation] report, asked that the Investigator verify with the Complainant how she arrived at her conclusion that [John] w[as] the person in the room with her."

46. The Hearing Officer's request ultimately resulted in a one-page "investigation supplement," identified as Exhibit 21 within the investigation report and exhibits binder. Rather than interviewing the alternate suspect alleged by John, the investigator asked the Complainant why she felt sure John was the person who sexually assaulted her and further interviewed a

witness who the Complainant believed had opened the door and seen her with John in the bedroom that night. That witness stated he did not knock on or open the door as alleged by the Complainant. The Complainant stated she felt certain that John was the perpetrator and advised the investigator that she did not believe any additional witnesses should be questioned in this case. That was the extent of the supplemental investigation performed in this case.

**E. A&M's Title IX Hearing and Appeals Process**

47. Although true cross-examination and attorney advocacy would not be permitted during the Title IX hearing, John was permitted to submit proposed questions to the Hearing Officer for consideration several days before the scheduled hearing.

48. The Hearing Officer provided notes requesting edits to some questions and rejecting other proposed questions the afternoon before the scheduled hearing.

   a. Although it was the Complainant's belief that no consensual sexual activity could take place if either or both parties had previously consumed alcohol (and this belief seemingly served as her basis for filing the complaint against John at the outset), the Hearing Officer rejected any proposed questions seeking to understand the parties' subjective interpretations of consent.

   b. The Hearing Officer further limited proposed questioning of the Complainant surrounding her frame of mind at the time she alleges John began kissing her on the night in question, holding that the kissing had not been identified as a separate offense or violation and was therefore irrelevant to the issues before her at the hearing.

    c.  It was around this same time that the Hearing Officer informed John that his sexual assault complaint had not been formally filed and would therefore not be considered by her in the course of the upcoming hearing.

49. The Hearing Officer conducted the final hearing in this case on November 12, 2020. The investigator (author of the investigation report), the parties, several witnesses who were present in Gruene on the night in question, and a superior officer in the Corps of Cadets testified and were subjected to restricted cross-examination by the parties' advisors at that time.

50. The Hearing Officer outlined her determinations finding John responsible for sexual assault and conduct unbecoming of a cadet in her November 22, 2020 Hearing Outcome Letter. The Hearing Officer believed that the complainant's testimony concerning her level of intoxication that evening indicated that she was incapable of providing consent and further noted that John's "inability to recall what happened that evening means he cannot provide evidence that the Complainant consented to sex[] or that he was not the person who sexually assaulted her."

51. The Hearing Officer imposed the following sanctions against John as a result of her findings: (1) A one-year suspension to begin on December 31, 2020 until December 31, 2021. Thereafter John would be "eligible for re-enrollment[,]" but was "not guaranteed readmission[;]" (2) The mutual no-contact order between the parties would remain in effect indefinitely; (3) John must enroll and complete the University's Ethic's & Decision Making Workshop; (4) John must write a "reflective paper" of at least 700 words no later than December 31, 2021; and (5) John must attend the University's Alcohol Education Workshop no later than June 1, 2021.

52. John appealed the Hearing Officer's findings and sanctions on November 30, 2020.

    a. More specifically, John argued that A&M's failure to concurrently consider his sexual assault complaint against his accuser constitutes a significant procedural error or omission warranting remand if not outright reversal in his case.

    b. John further argued that the Hearing Officer improperly shifted the burden of proof in the case. Because John was too intoxicated to recall anything that occurred on the night of March 6, 2020, he would not be able to prove that his accuser consented to any alleged sexual activity or definitively show that no such alleged conduct took place. As a result, and based on the female complainant's unclear assertions of feeling "not okay" about the alleged conduct in the days following, the Hearing Officer ruled that John had committed a sexual assault.

    c. John also alleged A&M's failure to confer with a medical expert concerning the potential physiological effects resulting from John's high BAC level (0.232) restricted his ability to vigorously defend himself against the allegations.

53. Less than 24 hours after John filed his appeal, he received a letter from the Interim Chairperson for the University Disciplinary Appeals Panel ("UDAP") summarily rejecting it. In accordance with University rules governing students' appeals process, the record reviewed by UDAP would have contained the appeal request, the investigation report (134 pages including exhibits), the Hearing Officer's decision letter, as well as video footage of the Title IX hearing (approximately six hours in length in John's case).

54. Importantly, the appellate authority who denied John's appeal seemingly recognized that the absence of expert testimony from a medical professional limited John's ability to defend himself. In her letter, she noted "consultation with a medical expert would allow

'exploration' of your capacity, but still would not have provided definitive proof of your ability to do the things [alleged]." Despite this, she found that "this would not likely have substantially altered the information available . . . [and it was therefore] unlikely this would have altered the outcome."

    a. The limited bases for appeal provided by A&M's rules do not require that any procedural errors alleged by the appealing party would have undoubtedly altered the outcome in a given case. A procedural error's potential to affect or alter the outcome in a significant way would thus warrant further appellate review. *See, e.g.,* Rule 6.1 of A&M Rule 08.01.01.M1.01, attached as Exhibit 3 at p. 20.

55. In her letter denying Plaintiff's appeal, the Interim Chairperson for UDAP advised that, "[a]fter reviewing the record and the submitted appeal documents, the appeal will not move forward." The letter concluded by advising John that "[t]his decision is final and there is no point of appeal beyond this process."

## <u>COUNT I – DECLARATORY JUDGMENT</u>

**A. Title IX**

56. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

57. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

58. Defendant A&M is an education program or activity operated by recipients of Federal financial assistance.

59. Like many education programs throughout the nation, A&M has been under continual pressure to impose discipline on students to avoid pressure from the Department of Education.

60. Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

    a. Although John and the female student allegedly both engaged in the same conduct – sexual contact with an intoxicated person – only the male, John, was subject to discipline by A&M.

    b. The gender of the alleged victim was the motivating factor in the decision to impose discipline.

61. A&M thus permitted impermissible gender bias against John in the investigation and adjudication of the March 6, 2020 incident.

62. The decision of the Hearing Officer and the subsequent affirming decision issued by the Interim Chairperson for the UDAP were erroneous outcomes, which were the direct result of a flawed proceeding.

63. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous finding and the decision to impose discipline upon John. These circumstances include:

    a. A general atmosphere at A&M, and many other universities across the country, where those who lodge a complaint of sexual assault are immediately treated as "survivors."

    b.   The failure of A&M to provide adequate due process in the hearing and appeals process.

64. The circumstances of the investigation and hearing cast doubt on the accuracy of the outcome of the disciplinary proceeding.

65. John and the Defendant have a dispute about whether A&M's Sexual Misconduct Policy, both facially and as applied to John, violates Title IX.

66. John is entitled to a declaration that A&M's Sexual Misconduct Policy violates Title IX.

**B. Due Process**

67. Plaintiff incorporates, by reference, each and every preceding paragraph as if fully restated herein.

68. The Fifth Amendment to the United States Constitution, made applicable to the State of Texas by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

69. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

70. The Due Process Clause of the United States Constitution is implicated by higher education disciplinary decisions, including the disciplinary decisions under A&M's Sexual Misconduct Policy.

71. A&M had a constitutional obligation to provide a fundamentally fair and reliable hearing process.

72. A&M had an obligation to undertake a full, fair, and impartial investigation.

73. John was entitled under the Constitution of the United States the opportunity to be heard in a meaningful manner at A&M's hearing.

74. John's interests in the results of the investigative and hearing process are significant.

   a. Suspension from A&M would deny John the benefits of education at his chosen school, at least temporarily if not permanently.

   b. Suspension and other sanctions would also damage John's academic and professional reputation.

   c. Suspension and/or other sanctions are likely to affect John's ability to enroll at other institutions of higher education and to pursue a career.

75. Defendant Texas A&M University violated John's due process rights in the following manner:

   a. Defendant did not undertake a full, fair, and impartial investigation.

   b. Defendant did not permit John to be fully and effectively represented by counsel.

   c. Defendant permitted the use of hearsay evidence at the hearing without providing John the opportunity to effectively cross-examine witnesses.

   d. Defendant relied upon a "preponderance of the evidence" standard.

76. John and the Defendant have a dispute about whether A&M's Sexual Misconduct Policy, both facially and as applied to John, violates the Due Process Clause of the United States Constitution.

77. John is entitled to a declaration that A&M's Sexual Misconduct Policy violates the Due Process Clause of the United States Constitution.

[ *continued on the following page* ]

## COUNT II – TITLE IX
### *Title IX: Erroneous Outcome & Selective Enforcement*
### 20 U.S.C. § 1681, et seq.

**A. Erroneous Outcome**

78. Plaintiff incorporates, by reference, each and every preceding paragraph as if fully restated herein.

79. Title IX applies to an entire school or institution of higher education if any part of that school receives federal funding. Texas A&M University receives federal funding and is covered by Title IX.

80. Title IX "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" A university violates Title IX when it reaches an erroneous outcome in a disciplinary proceeding when the reason for that erroneous outcome is gender bias.

81. A&M and its Title IX Office are motivated to portray the University in local and national media as being tough on males who are accused of sexual misconduct on campus.

82. The University and its Title IX Office are also motivated to protect the reputation of the University by preventing the University from being the target of a Title IX lawsuit from a female who has accused a male student of sexual misconduct.

83. The University and its Title IX Office are also motivated to protect the University from federal financial penalties for failing to comply with the policies and guidance issued by the Department of Education.

84. In the present case, the University, its Title IX investigator, the Hearing Officer, and the Interim Chairperson of the UDAP made erroneous rulings in finding John guilty of sexual assault and imposing the recommended sanctions against him.

85. As a result of the foregoing, the University reached an erroneous outcome in the disciplinary action against Plaintiff in this case. It reached an erroneous outcome because the process and those responsible for carrying out the process are predisposed to favor a female accuser over a male who has been accused (even when John himself had also identified as a victim).

**B. Selective Enforcement**

86. Plaintiff incorporates, by reference, each and every preceding paragraph as if fully restated herein.

87. A University is liable for gender discrimination under Title IX if its decision to initiate disciplinary proceedings is affected by the student's gender.

88. Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

89. At most, the evidence obtained during the investigation in this case and at the hearing indicated that John and the female student had consensual sex while intoxicated.

90. The male student, John was charged and punished for sexual assault and the female student was not. The reason for this inequity is gender bias.

91. If the standard for when a student is unable to consent to sex is truly as low as mere intoxication, then the evidence in this case supports the proposition that John was intoxicated and therefore unable to consent to sex due to incapacitation.

92. If both students were intoxicated, and therefore incapacitated, then both students were in violation of University rules. Under that logic they both should have been suspended if the school were not discriminating against males. If intoxication actually invalidates consent, then in this case the school is enforcing their rules against the male student.

93. To the extent incapacitation means something more than mere intoxication at A&M, the fact that John's BAC level was nearly double that of his female accuser's on the night in question further indicates improper gender bias in A&M's application of its sexual misconduct policies.

94. This is intentional gender discrimination under Title IX and it has resulted in disciplinary proceedings against John and a concomitant failure to conduct a concurrent investigation against his female accuser, who admittedly engaged in sexual activity with John when he was intoxicated.

95. A&M thus committed impermissible gender bias against John in the investigation and adjudication of the March 6, 2020 incident.

96. As a direct and proximate result of the Defendant's violations of John's rights under Title IX, John has suffered severe and substantial damages. These damages include diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

97. Pursuant to 42 U.S.C. § 1988, John is entitled to his attorney's fees incurred in bringing this action.

## COUNT III – INJUNCTIVE RELIEF

### A. Temporary Restraining Order

98. Plaintiff realleges and incorporates all the allegations contained in the preceding paragraphs of this Petition as though fully rewritten herein.

99. Plaintiff seeks this Court's issuance of an emergency temporary restraining order and preliminary injunction against Texas A&M University and halt A&M's suspension against him. Plaintiff will file a motion to this effect concurrently with the filing of his Original Verified Complaint.

100.    Pursuant to Local Rule LR7.5.A, Plaintiff respectfully requests this Court hear oral arguments concerning his request that an emergency temporary restraining order and, upon notice to Defendant, a preliminary injunction issue against A&M to maintain John's status as a student in good standing with the University.

## JURY DEMAND

101.    Plaintiff demands trial by jury on all issues and defenses in this case.

## DAMAGES

102.    Plaintiff seeks all damages allowed under the law, including monetary relief, and:

a.  Plaintiff seeks an injunction that prohibits Defendant from instituting its one-year suspension against John.

b.  Plaintiff seeks compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, stress, and other nonpecuniary losses.

c.  Plaintiff seeks reasonable attorney's fees and costs, including reasonable expert fees.

d.  Plaintiff seeks pre- and post-judgment interest at the maximum rate allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff John Doe respectfully prays that:

A.  Texas A&M University, Defendant, will be cited to appear and answer herein;

B.  A temporary restraining order will issue without notice to Texas A&M University, Defendant, Defendant's officers, agents, servants, employees, successors and assigns,

and attorneys from directly or indirectly proceeding with Plaintiff's suspension unless and until final resolution of the matter may be reached through trial on the merits or subsequent appeal;

C.  The Court not set a bond for the temporary restraining order;

D.  After notice and hearing, a preliminary injunction will issue enjoining and restraining Texas A&M University, Defendant, Defendant's officers, agents, servants, employees, successors and assigns, and attorneys from directly or indirectly proceeding with the suspension unless and until final resolution of the matter may be reached through trial on the merits or subsequent appeal;

E.  And, that this Court grant declaratory judgment as requested herein; and

F.  For such other and further relief, in law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

DAVID K. SERGI AND ASSOCIATES, P.C.

/s/ David K. Sergi
**DAVID K. SERGI** – Attorney in Charge
Texas Bar No. 18036000
Federal Bar No. 755
Email:  david@sergilaw.com
**KATHERINE FRANK**
Texas Bar No. 24105630
Email:  katie@sergilaw.com
329 S. Guadalupe St.
San Marcos, TX 78666
Tel. (512) 392-5010
Fax. (512) 392-5042

LAW OFFICE OF ANITA KAWAJA
Anita Kawaja
State Bar No. 24003282
Federal Bar No. 26012
Email: Anita@AnitaKawajaLaw.com

P.O. Box 31400
Houston, TX 77231
Tel.: (713) 775-5679

COUNSEL FOR PLAINTIFF
JOHN DOE

## CERTIFICATE OF SERVICE

I certify that on December 22, 2020 a true and correct copy of Plaintiff's Original

Verified Complaint was served on Ray Bonilla, general counsel for the Texas A&M University

System, electronically through email correspondence via rbonilla@tamus.edu.

/s/ *David K. Sergi*
David K. Sergi

# Exhibit 1





## UNIVERSITY RULE

**08.01.01.M1**    **Prohibited Conduct: Discrimination, Harassment, Complicity, and Related Retaliation based on a Protected Characteristic**

*Approved February 29, 2012*
*Revised September 16, 2016*
*Revised August 5, 2019*
*Next scheduled review: August 5, 2024*

---

**Rule Summary**

---

Six core values are at the heart of what Texas A&M University is all about: loyalty, integrity, excellence, leadership, respect and selfless service. Consistent with these values, the University reaffirms its commitment to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community.

Texas A&M University bars Students, Employees and Third Parties from engaging in discrimination and/or harassment on the basis of race, color, sex, gender identity, age, religion, disability, national origin, sexual orientation, genetic information or veteran status.  In addition, acting in complicity with another who engages in any of these forms of Prohibited Conduct, or retaliating against a person who participates in protected activity, is also prohibited.

---

**Definition of Prohibited Conduct**

---

**Prohibited Conduct** under this Rule includes discrimination, harassment (including non-consensual sexual contact, sexual assault, sexual exploitation, dating abuse/violence, domestic abuse/violence, stalking, quid pro quo and hostile environment sexual harassment), complicity, and retaliation.

---

**Official Rule/Responsibilities**

---

1.    RULE AGAINST PROHIBITED CONDUCT

    1.1    Students, University Employees and Third Parties shall not engage in Prohibited Conduct, including acting in complicity with another who engages in Prohibited Conduct, or

retaliating against a person who reports or participates in the reporting or investigation of Prohibited Conduct.

1.2     This Rule applies to all University 1) Students, 2) Employees, including all full-time and part-time faculty[1], full-time and part time staff, temporary employees, professional research staff, and post-doctoral fellows ("Employees"); and, 3) contractors, vendors, visitors, volunteers, guests or other third parties ("Third Parties").

1.3     This Rule applies to acts of "Prohibited Conduct" committed by Students, Employees or Third Parties when:

(a) The conduct occurs on University grounds or other property owned or controlled by the University;
(b) The conduct occurs in the context of a University employment or education program or activity, including, but not limited to, University-sponsored education abroad, research, on-line, or internship programs; or
(c) The conduct occurs outside the context of a University employment or education program or activity but creates a hostile environment for Students, Employees, or Third Parties while on University grounds or other property owned or controlled by the University or in any University employment or education program or activity. The Assistant Vice President and Title IX Officer or designee shall decide whether this Rule shall be applied to such conduct on a case by case basis.  The decision of the Assistant Vice President and Title IX Officer is final and unappealable.

1.4     Some conduct, while inappropriate, does not rise to the level of Prohibited Conduct.  These behaviors will be addressed by the appropriate disciplinary authority (e.g., Department Head, Student Conduct, Human Resources, etc.) under rules or regulations other than this rule.

1.5     This Rule applies to all reports of Prohibited Conduct received by the University on or after August 5, 2019.

2.      <u>REPORTING OBLIGATIONS</u>

Except for (1) employees identified as *Confidential Employees* in this Rule, and/or (2) employees who have received a reporting exemption from the Office of Risk, Ethics, and Compliance (OREC) for IRB-approved research, all other TAMU Employees who experience, observe, or become aware of Prohibited Conduct must promptly report all known information, including the identities of witness and involved parties, to the University as set forth below. Students workers are not required to report Prohibited Conduct if the student worker experiences, observes or becomes aware of the Prohibited Conduct outside the context of their student worker employment. Employees who become aware of Prohibited Conduct should advise the reporter (1) that they cannot keep reports of Prohibited Conduct confidential, and (2) that they are required to report the Prohibited Conduct to the University.  Students, staff, and faculty should be aware that sharing information about Prohibited Conduct with an employee of the University, other than an employee

---

[1] Although they are not employees, affiliated faculty will be treated as faculty for  the purpose of this rule and 08.01.01.M1.01

identified as a Confidential Employee in this Rule, will result in that employee sharing the information with an appropriate University official for review and investigation.

Students and Third Parties are strongly encouraged (but not required) to report Prohibited Conduct.

Allegations of sexual or gender-based harassment, sexual assault, sexual exploitation, nonconsensual sexual contact, stalking, domestic violence or dating violence disclosed to Confidential Employees will not be reported to the University, except as required by law. For example, licensed healthcare providers at the Student Health Services report de-identified statistics regarding this conduct to the University in compliance with the Clery Act.

Confidential Employees are available to support both Complainants and Respondents.

2.1    Reporting to the University

Reports that a Student, Employee or a Third Party has engaged in Prohibited Conduct should be made to the Department of Civil Rights and Equity Investigations (CREI), as follows:

Jennifer Smith
Assistant Vice President and Title IX Officer
Medical Sciences Library
202 Olsen Blvd, Suite 007
College Station, TX  77843
(979) 458-8407
civilrights@tamu.edu

Reports that the Texas A&M President, or an employee who reports directly to the President, has engaged in Prohibited Conduct should be made to the Texas A&M System Ethics and Compliance Office, as follows:

Texas A&M System Ethics and Compliance Office
301 Tarrow, 6th floor
College Station, TX 77843
(979) 458-6120
Civilrightsreporting@tamus.edu

2.2    Additional Options for Reporting to the University

(a) Individuals wishing to submit an anonymous report may do so through *Tell Somebody*, an electronic reporting option. Anonymous reporting may limit the University's ability to respond to the allegation.

Individuals may, but are not required to, report Prohibited Conduct to their direct supervisor, who should immediately report the information to CREI, as follows:

Jennifer Smith
Assistant Vice President and Title IX Officer
Medical Sciences Library
202 Olsen Blvd, Suite 007
College Station, TX  77843
(979) 458-8407
civilrights@tamu.edu

2.3     Reporting to Law Enforcement

Notwithstanding the mandatory reporting requirement for employees in section 2, anyone may report matters that they believe are criminal to the appropriate local law enforcement agency.  A Complainant may request assistance from CREI in notifying law enforcement authorities and always has the right to decline to notify law enforcement.

**A report to law enforcement, even to the University Police Department (UPD), is separate from a report to the University under this Rule**. An individual wishing to simultaneously pursue a law enforcement investigation and a University resolution of Prohibited Conduct should make a report to both entities.

2.4     Employees receiving a report under this Rule may not disclose the identity of the Complainant to any law enforcement authority unless:
> (a)  expressly authorized by the Complainant;
> (b)  imminent threat to health or safety exists; or
> (c)  required by law.

2.5     Although a report of Prohibited Conduct may be made at any time, regardless of when the alleged conduct occurred, a report should be filed as soon as possible after the action that caused the report. Prompt reporting assists investigators in the collection and preservation of evidence.

2.6     Individuals may file a complaint at any time with any local, state or federal civil rights office, including, but not limited to, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights and the U.S. Department of Justice.

2.7     The filing of a complaint will not stop, delay, or affect pending personnel or disciplinary actions.  This includes, but is not limited to, performance evaluations or disciplinary actions related to an employee or student who is not performing at acceptable levels or standards or who has violated System policies, regulations, or University rules.

2.8     When a student reports, in good faith, experiencing or witnessing an incident of sexual harassment, sexual assault, sexual exploitation, dating abuse/violence, domestic abuse/violence, or stalking, the University will not take disciplinary action against that student for violations of the Student Conduct Code occurring at or near the time of the incident reported.  The University may, however, investigate to determine whether a report of an incident of sexual harassment, sexual assault, sexual exploitation, dating

abuse/violence, domestic abuse/violence, or stalking was made in good faith.  The amnesty given in this section does not apply to a student who reports the student's own commission or complicity in the commission of sexual harassment, sexual assault, dating abuse/violence, domestic abuse/violence, or stalking.  The decision to grant or deny amnesty is final and cannot be appealed or revoked.

3.     UNIVERSITY RESPONSE TO REPORTS OF PROHIBITED CONDUCT

The University's response to allegations of Prohibited Conduct will be 1) prompt and equitable; 2) intended to stop and prevent the recurrence of any harassment; and 3) intended to remedy its discriminatory effects, as appropriate.  A substantiated allegation of prohibited conduct will result in disciplinary action, up to and including termination of employment or separation from the University. Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn.

The procedures for responding to allegations of Prohibited Conduct committed by Students, Employees and

Third Parties are detailed in SAP *08.01.01.M1.01, Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third-Parties.*

4.     WHERE THE RESPONDENT HAS MULTIPLE ROLES AT THE UNIVERSITY: If the Respondent has multiple roles, such as when the Respondent is both a student and an employee, the Chief Risk, Ethics, and Compliance Officer will consult with other relevant University Officials and then determine which procedure(s) to follow in the investigation and resolution of the allegations of Prohibited Conduct as well as other policy violations.  The Chief Risk, Ethics, and Compliance Officer will consider the known facts and circumstances, including which role predominates in the context of the Prohibited Conduct.

## Related Statutes, Policies, or Requirements

System Policy 08.01 *Civil Rights Protections and Compliance*

System Regulation 08.01.01 *Civil Rights Compliance*

University SAP 08.01.01.M1.01, *Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third-Parties*

## Contact Office

**Department of Civil Rights and Equity Investigations**

<span style="color:red">Exhibit 2</span>

## 08.01.01   Civil Rights Compliance



Revised July 7, 2020 (Effective August 14, 2020)
Next Scheduled Review:  July 7, 2025
Click to view Revision History.

## Regulation Summary

The Texas A&M University System (system) will provide equal opportunity to all employees, students, applicants for employment and admission, and the public.  This regulation provides guidance to each member in complying with local, state and federal civil rights laws and regulations (laws) and related system policy.

All complaints, appeals, or reports of discrimination received by the system will be appropriately reviewed and addressed in accordance with this regulation.

This regulation establishes systemwide standards for each member's receipt and processing of reports, complaints, formal complaints, investigations, adjudication, appeals, and use of informal resolution in cases involving allegations of discrimination, harassment and/or related retaliation based on a protected class (discrimination), including complaints made by employees, students and/or third parties.

A member also has a duty to respond to inappropriate employee or student conduct that does not constitute discrimination under this regulation.  See System Policy *32.02, Discipline and Dismissal of Employees*; System Regulation *32.02.02, Discipline and Dismissal of Nonfaculty Employees*; and System Policy *12.01, Academic Freedom, Responsibility and Tenure*.  For student misconduct, see the member's student code of conduct.

## Definitions

<u>Advisor</u> – an individual selected by each complainant and respondent to provide guidance during the investigation and resolution process and to conduct cross-examination when a complaint is referred to a formal hearing.  An advisor may be an attorney.  A member may appoint an advisor of the member's choice for a complainant or respondent for a hearing if either party does not have an advisor present.  Advisors may not otherwise represent or speak for the party they are advising. Each party is allowed one advisor, although members may establish circumstances under which a second advisor would be permitted (e.g., accommodating a party with a disability).  See Section 4.2.5.

<u>Appellate authority</u> – an individual or panel responsible for rendering appeal decisions as specified in member rules. The role of the appellate authority is to review the process by which an original decision was reached and render an appellate decision, consistent with the grounds for appeal. Title IX Coordinators may not serve as an appellate authority in any case involving an allegation of discrimination or harassment based on sex.

Coercion – the act, process, or power of compelling a person to take an action, make a choice, or allow an act to happen that they would otherwise not choose or give consent to.

Complainant – the individual(s) who is alleged to have been subjected to discrimination.

Complaint - an oral or written report of an alleged violation of this regulation.  A complaint may be filed by a complainant, any system member employee or student, or a third party.  The complaint does not have to meet the definition of a "formal complaint" (see below).

Confidential – communication that cannot legally be disclosed to another person without the consent of the individual who originally provided the information, except under very limited circumstances such as allegations of elderly, disabled or child abuse; an imminent threat of injury or to the life of any person; or as required by law.

Confidential reporter – an employee designated or permitted by a member to receive complaints of discrimination and maintain confidentiality.  Confidential Reporters are required to provide general nonidentifying information as required to comply with the Clery Act, and must report to the Title IX Coordinator any type of sex-based incident made known to them, but may not include any information that would violate that person's expectation of privacy. Exceptions to confidentiality/privacy include reports of child abuse, abuse or neglect of disabled or elderly persons, and when a party poses an imminent danger to themselves or others.

Consent – clear, voluntary and ongoing agreement to engage in a specific sexual act.  Persons need not verbalize their consent to engage in a sexual act for there to be permission.  Permission to engage in a sexual act may be indicated through physical actions rather than words.  A person who is asleep or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made by threat, coercion, or force, cannot give consent.  Consent may be revoked by any party at any time.

Dating violence – violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

   (a) The existence of such a relationship will be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

   (b) For the purposes of this definition:

      (1) Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

      (2) Dating violence does not include acts covered under the definition of domestic violence. [34 U.S.C. 12291(a)(10)]

      Dating violence is explicitly prohibited under this regulation.  Aiding another in the commission of dating violence is also prohibited under this regulation.  Dating violence is a form of sexual harassment or sex-based misconduct.

Designated administrator – the decision-making entity specified in member rules.  This may be an administrator or a hearing officer/panel but may not include a person with a clear conflict of interest (e.g., supervisor, subordinate, and/or family member of either party) or personal bias.  The role of the designated administrator is to determine whether or not allegations of misconduct rise

to the level of a violation of this regulation based on the evidence provided and utilizing the preponderance of the evidence standard.  The designated administrator cannot have served as an investigator nor may they later serve as an appellate authority in the same case.  Title IX Coordinators may not serve as a designated administrator in any case involving an allegation of discrimination or harassment based on sex.  Designated administrators may consist of a single decision-maker (hearing officer for formal hearings) or a group of decision makers (hearing panel for formal hearings).  When a hearing panel is utilized by a member, it must be chaired by a voting member and consist of an odd number of total voting members.

Discrimination - a materially adverse action or actions that intentionally or unintentionally excludes one from full participation in, denies the benefits of, or affects the terms and conditions of employment or access to educational or institutional programs because of an individual's race, color, sex, religion, national origin, age, disability, genetic information, veteran status, sexual orientation, gender identity, or any other classification protected by federal, state, or local law.  Discrimination includes harassment (based on both hostile environment and quid pro quo) and retaliation based on a legally protected category.

Domestic violence – a felony or misdemeanor crime of violence committed by:

   (a) a current or former spouse or intimate partner of the victim;

   (b) a person with whom the victim shares a child in common;

   (c) a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner;

   (d) a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; or

   (e) any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred.  [34 U.S.C. 12291(a)(8)]

   Domestic violence is explicitly prohibited under this regulation.  Aiding another in the commission of domestic violence is also prohibited under this regulation.  Domestic violence is a form of sexual harassment or sex-based misconduct.

Educational program or activity – an "educational program or activity" is interpreted broadly to include all of the member's operations, including locations, events, or circumstances over which the member exercised substantial control over both the respondent and the context in which the alleged discriminatory behavior occurred, including any building owned or controlled by a student organization that is officially recognized by the system member.

Employee – all personnel employed by the member including faculty, staff and students who receive compensation in either a full- or part-time capacity.  Employees who are also students would have their status in the civil rights process determined by the context of the allegations; these individuals are subject to civil rights processes, as well as student conduct and employment standards set by the member.

Exculpatory evidence – evidence that would tend to support a finding that a respondent did not commit the alleged misconduct.

Formal complaint – a document or electronic submission (such as by electronic mail or through an on-line portal provided for this purpose) filed by a complainant, or signed by the Title IX Coordinator, alleging sex-based discrimination against a respondent and requesting that the member investigate the allegation(s).  The formal complaint must contain the complainant's physical or digital signature, or otherwise indicate that the complainant is the person filing the complaint.  Alternatively, a Title IX Coordinator may sign a formal complaint but is not a complainant or otherwise a party to the complaint.

Hostile environment – a situation in which there is unwelcome harassing conduct based on a legally protected class that is severe, persistent, or pervasive enough to create a work, educational, or campus living environment that a reasonable person would consider objectively offensive.  The determination of whether an environment is "hostile" must be based on all of the circumstances, which may include the frequency of the conduct, the nature and severity of the conduct, whether the conduct was physically threatening or humiliating, and/or the mental or emotional effect of the conduct on the individual(s) subjected to the alleged discrimination.

Incapacitated – a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decisions about consent to sexual activity and recognizing the consequences of their decision.

Inculpatory evidence – evidence that would tend to support a finding that a respondent is responsible for alleged misconduct.

Informal resolution – resolution of a civil rights complaint without the use of a formal hearing.  Informal resolutions may or may not involve the establishment of findings of fact and the application of sanctions.

Investigative authority – one or more trained individuals appointed to conduct a formal investigation to discover and examine the facts of an allegation and conclude if, based on the preponderance of the evidence, the allegation is substantiated, unsubstantiated, or if there is insufficient information.   In complaints involving allegations of sex-based behaviors, the investigative authority will be limited to only reporting the evidence collected during the investigation, as well as issuing appropriate determinations surrounding credibility of witnesses and evidence.

Member – any or all members of The Texas A&M University System, including universities, agencies and System Offices.

Misconduct – an action or actions that violate published behavioral standards.

Objectively offensive – behavior determined by a reasonable person to be offensive.

Offensive – actions that cause unreasonable harm or distress to another individual or group of people.

Persistent – conduct occurring frequently over an unspecified period of time.

Pervasive – conduct existing in or spreading over a large area of an activity or program over a period of time.

Predation – an intent to engage in acts of misconduct prior to their occurrence demonstrating premeditation, planning or forethought, and is reflected in communicated intent (physical, verbal, visual, or written), threats directed at a party, attempts to incapacitate a party, attempts to isolate a party, utilizing physical force or violence, or other actions that a reasonable person would construe as a pre-meditation to engage in actions that are unwanted by/against the recipient.  Committing any of these actions with an individual under the age of consent is also considered predatory.

Preponderance of the evidence – what is more likely than not to be true, based on the totality of the available evidence.  The preponderance of the evidence is the standard of evidence used for all determinations made under this regulation.

Private – that which affects, characterizes, or belongs to an individual person, as opposed to the general public.  With respect to this regulation, private means restricting information to those with a reasonable need to know.

Private body parts – a person's breast, posterior (butt), groin, and/or genitals.

Quid pro quo sexual harassment – "this" for "that"; i.e., unwelcome sexual advances, requests for sexual favors or other verbal, nonverbal or physical conduct of a sexual nature, the submission to or rejection of which may result in an adverse educational or employment action.  Quid pro quo sexual harassment is explicitly prohibited under this regulation.  Aiding another in the commission of quid pro quo sexual harassment is also prohibited under this regulation.

Reasonable person – a comparative standard on one person's assessment of an action, actions, or situation compared with how most persons might act or react based on similar circumstances.  This standard considers the identities of an individual as well as the context of the actions being evaluated.

Remedies – actions taken to restore or preserve equal access to the member's education program or activity.  Remedies may be disciplinary in nature and may burden the respondent.

Reporter – an individual who observed or was made aware of an alleged violation and who provides an initial oral or written account of an alleged violation of this regulation.

Respondent – an individual who has been alleged to have engaged in discriminatory conduct as defined in system policy and this regulation.

Retaliation -– intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured under civil rights laws and regulations, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing.  The exercise of rights protected under the First Amendment does not constitute prohibited retaliation, nor does the filing of a mandatory report as required by Section 2.1 of this regulation.  In addition, a university official who files a mandatory report or charges an individual with making a materially false statement in the course of an investigation has not engaged in prohibited retaliation.  Retaliation is explicitly prohibited under this regulation.  Aiding another in the commission of retaliation is also prohibited under this regulation.

Severe – of sufficient seriousness to interfere with the rights, privileges, and legal activities of an individual, as well as actions that would be deemed by a reasonable person to be extreme or life-threatening.

**Sexual assault** – an offense that meets the definition of rape, fondling, incest or statutory rape as used in the FBI's Uniform Crime Reporting system.  A sex offense is any sexual act directed against another person, without the consent of the victim, including instances in which the victim is incapable of giving consent.  These offenses are defined as:

Rape: The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

Fondling: The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity.

Incest: Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

Statutory Rape: Sexual intercourse with a person who is under the statutory age of consent.

Sexual assault is explicitly prohibited under this regulation. Aiding another in the commission of sexual assault is also prohibited under this regulation. Sexual assault is a form of sexual harassment or sex-based misconduct.

**Sex-based misconduct** – unwelcome conduct on the basis of sex that is severe, persistent, or pervasive enough to create a work, educational, or campus living environment that a reasonable person would consider intimidating, abusive, or offensive.  Sex-based misconduct is explicitly prohibited under this regulation.  Aiding another in the commission of sex-based misconduct is also prohibited under this regulation.  Sex-based includes, but is not limited to, sexual assault, sexual exploitation, dating violence, domestic violence, and stalking based on sex.

**Sexual exploitation** – a situation in which an individual(s) takes non-consensual or abusive sexual advantage of another for his or her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited.  For example, sexual exploitation could include such actions as secretly videotaping sexual activity, voyeurism, sexually-based stalking, invasion of sexual privacy, exposing one's genitals or causing another to expose one's genitals, and knowingly exposing another person to a sexually transmitted infection or disease.  Sexual exploitation is a form of sex-based misconduct.

**Sexual harassment** – a form of sex discrimination.  Unwelcome conduct on the basis of sex (of a sexual nature or otherwise): (1) by an employee of the member who conditions the provision of an aid, benefit, or service of the member on an individual's participation in that unwelcome sexual conduct; (2) determined by a reasonable person to be so severe and pervasive and objectively offensive that it effectively denies a person equal access to the member's education program or activity; or (3) sexual assault or dating violence, domestic violence, or stalking based on sex.

**Stalking** – engaging in a course of conduct directed at a specific person that would cause a reasonable person to:

(a) fear for the person's safety or the safety of others; or

(b) suffer substantial emotional distress.

For the purposes of this definition:

(a) *Course of conduct* means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

(b) *Reasonable person* means a reasonable person under similar circumstances and with similar identities to the victim.

(c) *Substantial emotional distress* means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.  [34 CFR 668.46(a)]

Stalking is explicitly prohibited under this regulation.  Aiding another in the commission of stalking is also prohibited under this regulation.  Stalking based on sex is a form of sexual harassment or sex-based misconduct.

Student – individual enrolled in member universities or someone who has accepted an offer of admission or, if not currently enrolled, otherwise has a continuing relationship with the university; for example, someone enrolled in a future semester.  Students who are also employees would have their status in the civil rights process determined by the context of the allegations; these individuals are subject to civil rights processes as well as student conduct and employment standards set by the member.

Supportive measures – non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed.  Such measures are designed to restore or preserve equal access to the member's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the member's educational or work environment, or deter sexual harassment.  Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus or workplace, and other similar measures.

Title IX Coordinator – an employee designated and authorized to coordinate the member's efforts to comply with its responsibilities under the Title IX of the Education Amendments of 1972 Act.

# Regulation

1.  RESPONSIBILITIES OF MEMBERS

Each member chief executive officer (CEO) has the primary responsibility for ensuring compliance with civil rights laws and related system policy.

1.1   The CEO must designate a contact person(s) responsible for overseeing its civil rights protections program.  This person(s) will ensure that all complaints of discrimination are

promptly, thoroughly, and equitably investigated and resolved in accordance with this regulation. The designee(s) will periodically follow up on situations in which discrimination is found to ensure that the situation does not reoccur.

1.2     Members must designate at least one Title IX Coordinator, who may or may not be the same employee designated in 1.1 above.  Members must notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, and employees of the name or title, office address, electronic mail address, and telephone number of the employee(s) designated as the Title IX Coordinator(s).  The notification should also state that the member does not discriminate on the basis of sex in its education programs and activities, including admission and employment, in accordance with Title IX of the Educational Amendments of 1972 and its implementing regulations.  The contact information for the Title IX Coordinator(s) must be prominently displayed on the member's website and in each handbook or catalog that it makes available to persons entitled to notification as listed above.

1.3     Members receiving an inquiry or a charge of discrimination from a local, state or federal agency must immediately inform the System Ethics and Compliance Office (SECO) which will, in coordination with the System Office of General Counsel (OGC), serve as the liaison between the member and the agency.

1.4     Each member must adopt and publicly display a rule for the receipt, investigation and prompt and equitable resolution of discrimination complaints, in accordance with this regulation. Rules must be published in student and personnel handbooks or the institution's equivalents, if any, and published on a dedicated website. Individuals entitled to notifications as specified in Section 1.2 must be provided notice of the member's grievance process, including how to report or file a complaint of discrimination, how to report or file a formal complaint of sexual harassment, and how the member will respond.

1.5     To ensure consistency, thoroughness and impartiality, each member will designate one office (designated office) to receive and investigate all complaints involving a student respondent(s) and one office (designated office) to receive and investigate all complaints involving an employee or third party respondent(s).  All complaints can be handled by the same office.

1.6     Member universities must provide orientation training to all entering freshman and undergraduate transfer students on sexual harassment, sexual assault, dating violence, and stalking during the student's first semester.  Students are required to complete this training.  The training may be conducted in person or online at the discretion of the member university.

1.7     Member universities must develop and implement comprehensive prevention and outreach programs on sexual harassment, sexual assault, dating violence, and stalking. These programs must address prevention strategies and reporting protocols.  Reporting protocols must also be emailed to each student at the beginning of each fall and spring semester.

1.8     To facilitate effective communication and coordination regarding allegations of sexual harassment, sexual assault, dating violence, and stalking at the institution, member

universities must enter into one or more memoranda of understanding with an entity from one or more of the following categories, as agreeable to these entities:

(a) local law enforcement agencies;

(b) sexual harassment, sexual assault, dating violence, or stalking advocacy groups; and

(c) hospitals or other medical resource providers.

1.9 Members must ensure that all of those involved in the administration of civil rights complaints (including but not limited to: reporting, administering, investigating, adjudicating, advising, and informal resolution) complete annual training specific to their roles in accordance with requirements established by SECO. A document entitled *Minimum Training Requirements for Civil Rights Investigations, Advisement, Adjudication, Appeals, and Informal Resolution in The Texas A&M University System*, is an appendix to this regulation. Training requirements adopted by members must be consistent with the *Minimum Training Requirements* included in the appendix to this regulation. All campus law enforcement officers reviewing complaints based on sexual harassment, sexual assault, dating violence, and stalking must receive training in trauma-informed investigations. All training materials must be published on the member's website.

1.10 Members must provide a quarterly report to SECO on all alleged violations of System Policy *08.01, Civil Rights Protections and Compliance*. The format, timeline and specific reporting requirements will be developed and communicated by SECO.

## 2. RESPONSIBILITIES OF ALL EMPLOYEES AND STUDENTS

2.1 All employees are responsible for ensuring their work and educational environments are free from discrimination. When alleged or suspected discrimination is experienced by, observed by or made known to an employee in the course and scope of their employment, the employee is responsible for promptly reporting that information as outlined in Section 4.1, except as provided by Section 2.3. An employee's failure to report alleged or suspected discrimination may result in disciplinary action, including dismissal. A member must dismiss an employee if, in accordance with its applicable disciplinary processes, the member determines that the employee knowingly failed to make a required report, or that the employee, with the intent to harm or deceive, knowingly made a report that is false.

2.2 Notwithstanding Section 2.1, an employee is not required to report an incident in which that employee was a victim of sexual harassment, sexual assault, dating violence, or stalking, or an incident about which the employee received information due to a disclosure made at a sexual harassment, sexual assault, dating violence, or stalking public awareness event sponsored by the member, or by a student organization affiliated with the member, or under circumstances in which the person has either learned of the incident during the course of their employer's review or process, or has confirmed with the designated office overseeing the review or process, that the incident has been previously reported.

2.3 Only certain employees may keep complaints of discrimination confidential, such as licensed health care personnel and sexual assault advocates who have completed a

training program approved by the Attorney General of Texas, when acting in this capacity as part of their official employment.  Researchers are deemed confidential only when the research project is federally funded and the identity of research subjects on the specific project are deemed confidential by law.  These employees must provide information required under the Clery Act and other applicable state and federal law and regulation.  Confidential reporters must report to the Title IX Coordinator only the type of incident made known to them and may not include any information that would violate that person's expectation of privacy.    All other employees informed of possible discrimination should advise the reporter that they cannot keep the information confidential and are required to report it.  Employees should inform the reporter where confidential guidance can be obtained, such as the student counseling center or employee assistance program.  To the extent possible, the member will protect the privacy of all parties to the report.  (See definitions for "confidential" and "private.")

2.4    Each member university must designate one or more persons to serve as a person with whom students may speak confidentially concerning incidents involving sexual harassment, sexual assault, dating violence, or stalking, and who have reporting responsibilities consistent with expectations established in Section 2.3.  All students must be informed of the existence and identities of these confidential reporters.

2.5    Requests from complainants to withhold any name, or a request not to investigate or seek action against the respondent, will be considered by the member in the context of the member's duty to provide a safe and nondiscriminatory work, educational, and campus living environment.  This may require that the member take actions when the complainant requests no action, such as when violence is involved, when the threat of violence exists, or when required by law, as in the case of elderly, disabled, or child abuse.  A request to withhold information or not to investigate the alleged misconduct may limit the member's ability to respond.

2.6    In cases in which a complainant has requested that a member not investigate a complaint, the member may initiate an investigation based on the seriousness of the allegation, whether or not there are multiple allegations, and/or whether or not a respondent poses a risk of harm to others.  The member must inform the complainant of its intentions to investigate or to comply with the request not to investigate.

2.7    Reporters and complainants may, but cannot be required to, submit a complaint or report with any law enforcement authority.  Employees receiving a complaint under this regulation may not disclose the identity of the complainant to any law enforcement authority unless expressly authorized by the complainant, when an imminent threat to health or safety may exist, or when required by law.

2.8    Complainants and respondents may, at any time, file a complaint with any local, state or federal civil rights office, including, but not limited to, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and the U.S. Department of Justice.

2.9    Reports of suspected discrimination should contain as much specific information as possible to allow for proper assessment of the nature, extent, and urgency of preliminary investigative procedures and supportive measures.

2.10  All employees must, and students should, cooperate fully with those performing an investigation pursuant to this regulation.  Employees failing to cooperate with those performing an investigation may be disciplined, up to and including dismissal.

2.11  Employees and students must not retaliate against a person for filing a complaint or participating in an investigation under this regulation.  Employees and students found to have retaliated, or intentionally provided false or materially misleading information regarding alleged discrimination under this regulation, may be disciplined, up to and including dismissal or expulsion.  Employees and student must not retaliate against administrative personnel (e.g., Title IX Coordinator, Investigative Authority, Decision Maker, Hearing Panel members) for processing civil rights investigations under this regulation.

Prohibited conduct includes, but is not limited to:

(a) attempting to coerce, compel, or prevent an individual from reporting alleged discrimination or providing testimony or relevant information;

(b) removing, destroying, or altering documentation or other evidence (e.g., text messages) relevant to the investigation;

(c) providing false or misleading information to member officials who are involved in the investigation and resolution of a complaint, or encouraging others to do so; and

(d) using intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured under civil rights laws and regulations, or because the individual participated in any manner in the administration, investigation, proceedings, or hearings related to this regulation.

2.12  All employees are responsible for complying with state law requiring system training on equal opportunity and nondiscrimination within 30 days of hire and every two (2) years thereafter.

## 3.  RESPONSIBILITIES OF THE SYSTEM ETHICS AND COMPLIANCE OFFICE (SECO)

3.1  SECO, in coordination with OGC, will serve as the liaison between the members and any local, state or federal agency investigating a complaint of discrimination or conducting a civil rights audit or review.

3.2  In coordination with OGC, SECO will provide general guidance on the implementation of applicable laws, policies, regulations, rules, and appropriate training.

3.3  SECO is also responsible for the coordination of all reporting requirements related to equal opportunity and affirmative action for the system and its members.

## 4.  CIVIL RIGHTS COMPLAINT PROCESSING

4.1  <u>Complaints</u>

4.1.1  Except as specified in Section 2.3 and 2.4, an employee who experiences, observes, or becomes aware of alleged discrimination must promptly report the

incident(s) to a member official, administrator or other designee identified in the member's applicable rule.  If an employee reasonably believes that an incident constitutes sexual harassment, sexual assault, or domestic violence, dating violence, or stalking based on sex and that the incident is alleged to have been committed by or against a person who was a student enrolled at or an employee of the institution at the time of the incident, the employee must promptly report the incident to the member's Title IX Coordinator or Deputy Title IX Coordinator, or designee.  Students and third parties (including, but not limited to, anyone receiving services from the member, vendors and private business associates) are strongly encouraged to report the incident(s) promptly to the member's office designated to receive such complaints.  When applicable, an alleged victim of sexual harassment, sexual assault, or domestic violence, dating violence, or stalking based on sex should be encouraged to go to a hospital for treatment and/or preservation of evidence as practicable following an incident.

Any person may report sex discrimination, including sexual harassment (whether or not the person reporting is the person alleged to be the victim of conduct that could constitute sex discrimination) in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's verbal or written  report.  Such a report may be made at any time (including during non-business hours).

4.1.2   An employee or student is not required to report discrimination to a direct supervisor or to the alleged offender.  The alleged offense may instead be reported to another member official, administrator, supervisor or other designee identified in the member's applicable rule.  Each member must provide an anonymous electronic reporting option for students and employees as provided by state law.

4.1.3   Except as specified in Sections 2.2 and 2.4, the report must include all information concerning the incident known to the reporting person including whether a complainant has expressed a desire for confidentiality in reporting the incident.

4.1.4   An employee's or student's complaint alleging discrimination should be reported as soon as possible after the action that caused the complaint.

4.1.5   SECO is designated to receive, review, investigate, and adjudicate complaints against the chancellor, a member Chief Executive Officer (CEO), an employee who reports directly to a CEO or the chancellor, or a Title IX Coordinator.  The chancellor or designee will serve as the designated administrator in complaints against a member CEO or an employee who reports directly to a CEO.  The chair of the Board of Regents or designee will serve as the designated administrator in complaints against the chancellor or an employee who reports directly to the chancellor.

4.1.6   All complaints of discrimination should be reported immediately and must be reported to SECO and OGC in writing (through the centralized reporting process) within two (2) business days by the designated member office.

Notification to SECO and OGC must include the:

(a) date(s) of the complaint and alleged incident(s);

(b) nature and description of the alleged conduct;

(c) name(s), category (employee, student, and/or third party) and title(s), if applicable, of the individual who was subjected to the alleged discriminatory conduct; and

(d) name(s), category (employee, student, and/or third party) and title(s), if applicable, of the respondent(s), if known.

4.1.7   Not less than once every three months, the member Title IX Coordinator  must submit to the CEO a written  report on all complaints of sexual harassment, sexual assault, and dating violence, domestic violence, and stalking based on sex, as well as acts of sex-based misconduct alleged to have been committed by or against a person who was a student enrolled at or an employee of the institution at the time of the incident (without personally identifying information), including information regarding:

(a) the investigation of those reports;

(b) the disposition, if any, of any disciplinary processes arising from those reports; and

(c) the reports for which the institution determined not to initiate a disciplinary process, if any.

4.1.8   In addition, the member Title IX Coordinator will immediately report to the CEO an incident covered under Section 4.1.6 if the coordinator has cause to believe that the safety of any person is in imminent danger as a result of the incident.

4.1.9   At least once during each fall or spring semester, the CEO will submit to the Board of Regents and post on the member's website a report of complaints covered under Section 4.1.6.  However, the report:

(a) may not identify any person; and

(b) must include:

(1) the number of reports received;

(2) the number of investigations conducted as a result of those reports;

(3) the disposition, if any, of any disciplinary processes arising from those reports;

(4) the number of those reports for which the institution determined not to initiate a disciplinary process, if any; and

(5) any disciplinary actions taken.

4.1.10  Each CEO will annually certify in writing to the Texas Higher Education Coordinating Board that the university is in substantial compliance with Chapter 51 Education Code, Subchapter E-2.

4.1.11 The filing of a discrimination complaint will not stop, delay or affect pending personnel or disciplinary actions. This includes, but is not limited to, performance evaluations or disciplinary actions related to an employee or student who is not performing at acceptable levels or standards or who has violated system policies or regulations or member rules.

4.2    Investigations and Adjudications

4.2.1  The designated office(s) to receive complaints of discrimination will review each one to determine if there is sufficient information to proceed with an investigation or if additional information is needed.

(a)    If the information is insufficient, the designated office, in consultation with OGC, may conduct an initial assessment into the circumstances of the complaint and (1) dismiss it as baseless; (2) close it for insufficient information to investigate or lack of jurisdiction (see 4.2.9); (3) refer it to another office which has responsibility for such complaints; or (4) with the consent of the parties, as well as with the approval of SECO, refer the complaint to informal resolution. Cases involving allegations based on sex require the submission of a formal complaint before they may be referred to informal resolution. The designated office will notify the complainant of such action in writing.

(b)    If the information is sufficient, the designated office will forward the complaint to an appointed investigative authority within five (5) business days of the determination to proceed with the investigation.

(c)    The designated office will provide written  notification to the complainant(s) and the respondent(s) of: (1) receipt of the complaint stating the allegation of a violation of this regulation; (2) the appointed investigative authority; (3) the appointed designated administrator; (4) interim supportive measures, if any; (5) admonishments regarding cooperation and prohibiting retaliation, and (6) any informal resolution process that may be available.

(d)    An unredacted version of the complaint will be given to an employee respondent(s) and their advisor, if applicable, with admonishments regarding privacy.

4.2.2  At any point in the process, a respondent may be subject to removal from the member's education program or activity on an emergency basis, provided that an individualized safety and risk analysis (conducted by or in conjunction with a member's behavioral assessment team) has determined that an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies removal and provides the respondent with notice and opportunity to challenge the decision immediately following the removal. Upon being removed, any student respondent must be granted the opportunity for a hearing within five (5) business days to review whether or not the removal is warranted. The outcome of this hearing is not subject to appeal and is not a disciplinary action. Members shall designate the assignment of a hearing authority for this purpose.

4.2.3   Section 4.2.2 above does not preclude a member from suspending with pay, reassigning, and/or placing an employee in another type of temporary status pending completion of the investigation and final resolution of the allegations. This is not a disciplinary action.

4.2.4   The member should offer the complainant(s), the respondent(s) and other affected individuals supportive measures (see Definitions).  In all sex-based complaints, the Title IX Coordinator or designee must promptly contact the parties to discuss the availability of supportive measures, consider the parties' wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint.  Members must maintain the privacy of any supportive measures provided to the complainant or respondent to the extent that maintaining such privacy would not impair the ability of the member to provide supportive measures.  The Title IX Coordinator or designee is responsible for coordinating the effective implementation of supportive measures.  Failure to comply with the terms of supportive measures such as mutual no contact restrictions may be considered a separate violation of system policies and regulations and member rules and procedures.  In cases in which a student complainant and student respondent are enrolled in the same course, either student may elect to drop the course without any academic penalty.

4.2.5   Both the complainant(s) and the respondent(s) must receive equitable treatment in all facets of the complaint investigation and resolution process including, but not limited to, the right to an advisor (if any), the right to present evidence and witnesses, and the right to be informed of the outcome of the investigation.  Prior to any formal hearing, the role of any advisor will be limited to being present and communicating only with their advisee; advisors may not represent the party or otherwise actively participate in the process.

4.2.6   The investigative authority will review each complaint, interview witnesses (if applicable), review relevant documentation, and provide an initial draft report of their investigation to OGC for review within 30 business days.  OGC will coordinate with SECO and provide its review to the investigative authority within ten (10) business days.  The investigative authority will have five (5) business days to create a final draft report and share that document electronically with both the complainant and the respondent.  The complainant and respondent will have ten (10) business days to review the report and submit written commentary to the investigative authority.  The investigative authority will then have five (5) additional business days to prepare a final report for review by OGC and SECO, who will have five (5) business days to provide feedback.  The latter review provided by OGC and SECO may be waived by mutual agreement between the member and OGC/SECO if no substantive changes were made following the initial review.  The final report shall be submitted directly to the designated administrator.

4.2.7   Time frames for the receipt, investigation, and adjudication of complaints may be extended for good cause with written notice to the complainant and respondent of the delay and/or extension and the reasons therefor.  Good cause is to be

determined by the member in consultation with OGC and SECO and reasonable extensions may be granted at the discretion of the member.  The investigative authority should send an extension request, if needed, to the office or individual who appointed them.

4.2.8   If in the course of an investigation a member decides to investigate allegations about the complainant or respondent that were not included in the original notice, the member must provide notice of the additional allegations to the parties.

4.2.9   Complaints (or formal complaints in Title IX cases) will be investigated and adjudicated under one of the following processes:

  1.  Title IX (see 4.2.10)
  2.  Sex-Based Misconduct (see 4.2.11)
  3.  All other civil rights complaints (see 4.2.12)

  (a)  When a complaint involves allegations of misconduct that involve both sex-based allegations (1 and/or 2 above) and allegations of other civil rights violations (3 above), the process shall be conducted under the requirements established for sex-based offenses (1 or 2 above).  Sex-based complaints include those complaints based on sex, sexual orientation, and/ or gender identity.

  (b)  In addition to reviewing complaints against students for civil rights violations, members are expected to review allegations for possible violations of codes of student conduct and professional expectations of employees.

  (c)  When unprofessional behavior by an employee that does not rise to the level of a violation of this regulation is discovered during the civil rights investigation and adjudication process, the information will be forwarded to the employee's supervisor.

  (d)  When possible violations of the code of student conduct by a student that do not rise to the level of a civil rights violation are discovered during the civil rights investigation process, and where there are no civil rights charges brought forward as a result of the investigation, the information will be forwarded for review to the student conduct process.

  (e)  When possible violations of the code of student conduct by a student that do not rise to the level of a civil rights violation are discovered during the civil rights investigation process, and where there is also going to be an adjudication of the civil rights violation (through a formal hearing, or through informal resolution methods that result in a finding and sanction), the case will be consolidated into one adjudication conducted under the processes described in 4.2.9(a).

4.2.10  Title IX - The following applies to complaints of sexual harassment, sexual assault or domestic violence, dating violence, or stalking based on sex at member institutions of higher education only:

  (a)  Complaints will be processed under Title IX if all of the following apply:

    i.    The member has actual knowledge of a notice of sexual harassment or a complaint involving allegations of sexual harassment, sexual assault, and/or dating violence, domestic violence, and stalking based on sex to the member's Title IX Coordinator or any member official who has authority to institute corrective measures on behalf of the member.  Imputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge. Each member must designate in its rule which employees have the authority to institute corrective measures;

    ii.    A formal complaint is filed by the complainant or signed by the Title IX Coordinator (see Definitions);

    iii.    The alleged behavior/conduct must have occurred against a person while in the United States;

    iv.    At the time the formal complaint was filed, the complainant was participating or attempting to participate in the member's education program or activity.  This includes an enrolled student, an employee, and applicants for admission or employment at the system member, and;

    v.    The alleged conduct meets the definition of sexual harassment as set forth in this regulation (see Definitions).

(b) The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the member and not on the parties, provided that the member cannot access, consider, disclose, or otherwise use a party's records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in the professional's or paraprofessional's capacity, or assisting in that capacity, and which are made and maintained in connection with the provision of treatment to the party, unless the member obtains that party's voluntary, written  consent to do so for the grievance process.

(c) In all investigations and in any hearing, a presumption will exist that a respondent is not responsible for the allegations until a determination is made at the conclusion of an adjudicatory process.

(d) Mandatory dismissals - If the conduct alleged in the formal complaint would not constitute sexual harassment as defined even if proved, did not occur in the member's education program or activity, or did not occur against a person in the United States, then the member must dismiss the formal complaint with regard to that conduct for purposes of sexual harassment under Title IX; such dismissal does not preclude action under another provision of the member's conduct  standards, nor does it preclude the member proceeding with a civil rights process under this Regulation as Sex-based Misconduct provided that the investigatory, adjudicatory, and informal resolution processes are administered as outlined in Section 4.2.9.

(e) Discretionary dismissals - Members may also dismiss a formal complaint if the complainant notifies the Title IX Coordinator in writing that the complainant wishes to withdraw it, if the respondent is no longer enrolled or

employed by the member, or if specific circumstances prevent the member from collecting evidence sufficient to reach a determination (for example, when the complainant has ceased participating in the process; in certain fact-specific cases when the passage of time precludes the collection of sufficient evidence; when complainant's identity is not known; and when the exact same allegations have already been investigated and adjudicated); such dismissal does not preclude action under another provision of the member's conduct standards, nor does it preclude the member proceeding with a civil rights process under this Regulation as Sex-based Misconduct provided that the investigatory, adjudicatory, and informal resolution processes are administered as outlined in Section 4.2.9.

(f) Upon a dismissal required or permitted pursuant to (d) and (e) above, the member must promptly send written notice of the dismissal and the reason(s) therefore simultaneously to the parties.  The parties must be given the opportunity to appeal a dismissal to the member designated appellate authority.  Appeals processes will be established by each member in consultation with OGC and SECO.

(g) Members may consolidate formal complaints as to allegations of sex-based violations against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, when the allegations of sexual harassment arise out of the same facts or circumstances.

(h) Members must provide a notice of allegations in cases involving sex-based violations which include sufficient details known at the time and with sufficient time to prepare a response before any initial interview.  Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known.  The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process.  The written notice must inform the parties that they may have an advisor of their choice who may be, but is not required to be, an attorney, and that they may inspect and review evidence. The written notice must also inform the parties that they are prohibited from knowingly making false statements or knowingly submitting false information during the grievance process.  If, in the course of an investigation, the member decides to investigate allegations about the complainant or respondent that were not included in the original notice, the member must provide notice of the additional allegations to the parties whose identities are known.

(i) Members must provide to each party whose participation in the investigation is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, and other meetings, with sufficient time for the party to prepare to participate.

(j) Members must provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence; not restrict the ability of either party to discuss the

allegations under investigation or gather and present relevant evidence; provide the parties with the same opportunities to have others with them during the grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice; and not limit the choice or presence of the advisor in any meeting or grievance proceeding.  However, the member may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties.  Advisors who fail to adhere to established rules may be dismissed from the process at the discretion of the member.

(k) After the final draft investigation report is prepared, members must  provide parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint, including the evidence upon which the member does not intend to rely in reaching a determination regarding responsibility, and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation.  This includes sending to each party and the party's advisor, if any, the final draft investigation report (with exhibits) subject to inspection and review in an electronic format or a hard copy, and the parties must have at least ten (10) days to submit a written  response, which the investigative authority will consider prior to final completion of the investigative report.  Both the report and the collected evidence will be unredacted to the extent allowed by law.  Investigation reports should include a statement of the allegation(s), a listing of individuals interviewed including the dates of the interviews, all inculpatory and exculpatory evidence collected in the investigation, credibility assessments (which may not be based an individual's status as a complainant, respondent, or witness), and a listing of relevant documents attached to the report as exhibits.  Reports should not contain speculation, opinions, findings, decisions, or recommendations for sanctions.

(l) After the investigative authority has reviewed responses from the parties (if any), a final investigation report will be developed and sent to SECO and OGC for review, along with the responses from the parties. SECO and OGC have five (5) business days to provide feedback to the investigative authority, at which point the investigative authority will then have five (5) business days to finalize the investigation report.  The final investigation report will be issued to the designated administrator.  The review by OGC and SECO may be waived by mutual agreement between the member and OGC/SECO if no substantive changes were made to the draft report previously reviewed by OGC/SECO.

(m)The designated administrator or designee will provide the final investigative report and exhibits to the parties.  The parties will be provided a pre-hearing conference to review the hearing process as well as to explore any available options for informal resolution.  The parties will be provided at least ten (10) business days to review the final investigative report and to respond in writing to the designated administrator (if desired) prior to the hearing.

(n) At any time prior to the adjudication of a formal complaint, the parties may seek informal resolution to resolve the complaint. Informal resolution is described in 4.6.

(o)  Administrative conferences - If the complainant, respondent, and member all agree on both the findings associated with the allegations and the sanctions to be imposed, a designated administrator may reach a written resolution of the complaint without a hearing, provided any sanctions imposed are in compliance with the sanctioning requirements noted in 4.5.5. The pre-hearing conference may serve as the administrative conference.  Administrative conferences are considered a form of informal resolution (see 4.6).

(p) If a formal complaint cannot be resolved through an informal process or if either the complainant or the respondent requests a hearing, a formal live hearing will be conducted by the designated administrator (a hearing officer or hearing panel).  Under this option, the following rules apply:

  i. Unless waived by the parties, following the pre-hearing conference the parties will be given a minimum of five (5) business days notice of any formal hearing.  The notice must include the date, time, and location of the hearing, as well as instructions for those participating in hearings through online means.

  ii. Hearings will be closed to the public.  Members must create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review.  Physical access to the recording or transcript must be provided upon request for the purpose of preparing an appeal following the hearing.

  iii. A complainant and a respondent at a hearing must have an advisor with them.  In cases in which a party does not have an advisor, the university will provide a trained advisor to assist them in the hearing process. Training requirements for university advisors are outlined in the Training Requirements (see 1.9).

  iv. Cross-examination of the complainant, respondent, and any witnesses may not be conducted by the opposing party but must be conducted by their advisor.  Questions are to be directed to the hearing officer or hearing panel chair, who will determine whether or not each question will be admitted into the hearing.  If a question is deemed repetitious or not relevant, the decision-maker(s) must explain the decision to exclude it.  When parties are being subject to cross-examination, the advisor may not answer on behalf of the party.

  v. Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the alleged conduct, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.   The hearing panel chair or hearing officer makes final determinations on the relevance of questions and evidence.

vi. Attendance at a hearing may be in person or may be conducted through remote means, provided that all parties and the hearing officer or hearing panel can see and hear one another in real time during the course of the hearing.

vii. If a complainant, respondent, or witness is not in attendance at a live hearing, the hearing officer or hearing panel cannot rely on the previously submitted statements of the absent party in reaching a determination, but may utilize all other evidence, including witnesses who interacted with the absent party, but not hearsay testimony of what the absent party told that individual.  A complainant, respondent, or witness statement can also not be utilized in a determination if that person refuses to submit to cross-examination at a live hearing.

viii. Hearing officers/hearing panels cannot draw an inference regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions.

ix. No hearing officer or hearing panel member can also serve as an investigative authority or appellate authority in the same complaint. Students (who are otherwise not full-time employees) may not serve in the role of investigative authority, hearing officer, hearing panel member, or appellate authority.

x. When a hearing panel is being utilized to resolve a complaint, either a voting chairperson or non-voting administrative advisor who does not serve on the panel shall oversee the live hearing and deliberations, and assist in the development of a finding of fact, decision rationale, and, when appropriate, a sanction rationale in consultation with the panel members.

xi. Following the hearing, the hearing officer or hearing panel will develop a draft decision and submit the draft to SECO within two (2) business days. SECO will have a maximum of three (3) business days to provide feedback to the hearing officer/hearing panel.  Thereafter, the designated administrator will have a maximum of three (3) additional business days to issue a decision letter.  The decision letter must be sent simultaneously to both/all parties.

xii. Decision letters must include:

1. The identification of the allegations;

2. A description of the procedural steps taken from the receipt of a formal complaint through determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held if any;

3. Findings of fact supporting the determination;

4. Conclusion regarding the application of the member's conduct standards to the facts;

5. A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary

sanctions the member imposes on the respondent, and whether remedies designed to restore or preserve equal access to the member's education program or activity will be provided by the member to the complainant, and;

6. The member's procedures and permissible bases for the complainant and respondent to appeal.

xiii.  If for any reason there is reasonable cause for a member to delay the issuance of the decision letter, this will be communicated to the parties by the designated administrator or designee.

xiv.  If a student respondent withdraws or graduates from a member university pending the resolution of a complaint, the process will continue and, the member university will not issue a transcript on behalf of the student until the conclusion of the process.

xv.  Member universities, upon request by another postsecondary educational institution, must provide to the requesting institution any determination that a student violated the member university's code of conduct by committing sexual harassment, sexual assault, sex-based misconduct, and/or dating violence, domestic violence, and/or stalking based on sex.

4.2.11  Sex-based Misconduct - The following applies to complaints of sex-based misconduct at all member universities and agencies:

(a)  Cases involving allegations of  sexual harassment, sexual assault, and dating violence, domestic violence, and/or stalking based on sex that are subject to mandatory or discretionary dismissal from the Title IX process may be subject to investigation and adjudication as sex-based misconduct at the discretion of the Title IX Coordinator, in consultation with OGC and SECO.

(b)  All cases involving sex-based allegations are to be investigated and adjudicated under the procedures outlined in 4.2.9, noting that the process is to determine whether or not the allegations are substantiated and, if substantiated, created a hostile environment.

4.2.12  All Other Civil Rights Complaints (Non sex-based) - The following applies to all civil rights complaints based on race, color, religion, national origin, age, disability, genetic information, and/or veteran status:

(a)  After SECO's and OGC's review of the initial draft report, the investigative authority will have five (5) business days to create a final draft report and share that document electronically with both the complainant and the respondent. The complainant and respondent will have ten (10) business days to review the report and submit responses and/or written, relevant questions that the party wants asked of any other party or witness.  The investigative authority will, provide each party with the other party's questions and answers, and allow for additional, limited follow-up questions from each, provide each party with the questions and answers, and allow for additional, limited follow-up questions from each party.  The investigative authority will have ten (10) business days to complete this process.  The investigative

authority must explain to the party proposing the questions any decision to exclude a question as repetitious or not relevant.

(b) The investigative authority will then have five (5) additional business days to prepare a final report for review by OGC and SECO.  Once approved by OGC and SECO, the final report shall be submitted directly to the designated administrator.  Circumstances may warrant extensions to the time frames in this section.  The investigative authority should send an extension request, if needed, to the office or individual who appointed them. Both the complainant(s) and the respondent(s) should be notified of any extensions in writing.

(c) Investigation reports should include a statement of the allegation(s), a listing of individuals interviewed including the dates of the interviews, all inculpatory and exculpatory evidence collected in the investigation, credibility assessments (which may not be based an individual's status as a complainant, respondent, or witness), and a listing of relevant documents attached to the report as exhibits.  Investigators must conclude, based on the preponderance of the evidence, whether or not the alleged behavior/conduct occurred, did not occur, or there was insufficient evidence to establish that the behavior occurred or not, but will not determine whether or not the behavior establishes a violation of system or member regulations or rules.  Reports should not contain speculation, opinions, findings, decisions, or recommendations for sanctions.

(d) At any time prior to the adjudication of a formal complaint, the parties may seek informal resolution to resolve the complaint. Informal resolution is described in 4.6.

## 4.3   Decisions (non sex-based cases)

4.3.1   For a complaint against an employee or third party, the designated administrator will review the investigation report and provide a draft decision to OGC for review within five (5) business days after receiving the investigative authority's report.  OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days.  The designated administrator will have five (5) business days to finalize the decision and provide it to the complainant(s), the respondent(s), and the investigative authority.  In cases in which the allegations are substantiated, the final decision will be provided to the respondent's supervisor.  Circumstances may warrant extensions to the time frames in this section.  The designated administrator should send an extension request, if needed, to the office or individuals who appointed them.  Both the complainant(s) and the respondent(s) should be notified of any extensions in writing.

4.3.2   For student respondent cases, the investigation report will be used as directed in the university's student conduct rules.

4.3.3   For a complaint against a student, it is impractical for OGC to review the intended decision prior to issuance by the hearing officer or hearing panel.  Universities are therefore exempt from obtaining OGC review of the decision prior to issuance but may request assistance from OGC and SECO when needed.

4.3.4   When the respondent(s) is an employee, both the complainant(s) and the respondent(s) may review a copy of the investigation report and exhibits, with admonishments regarding privacy, after the decision is rendered.  The report will be redacted in accordance with state and/or federal law.

4.4   Sanctions

4.4.1   Disciplinary sanctions or other actions that are not supportive measures may not be imposed on respondents prior to a determination of responsibility except in cases meeting the requirements for removal on an emergency basis.

Remedies, which may be disciplinary or punitive in nature and may burden the respondent, must be designed to restore or preserve the complainant's equal access to the member's education program or activity.  Members must describe or list the range of possible disciplinary sanctions and remedies that the member may implement following any determination of responsibility for any discrimination finding in their member rule.

4.4.2   The designated administrator may decide sanctions, if any, or may delegate the sanctioning decision to another authority within the member.  Sanctioning decisions involving employees must be determined in consultation with OGC.  The sanctioning authority may review an unredacted copy of the investigation report and exhibits.

4.4.3   Sanctions may have educational, restorative and rehabilitative components for employees and/or students. In addition, employee sanctions may have punitive components.  Examples of sanctions may include, but are not limited to, written warning or reprimand, required training and/or counseling, "no contact" order, probation, suspension, and employment dismissal and/or student expulsion from an educational institution.  For students, expulsion is a disciplinary action taken to teach them that their actions and conduct have consequences, which includes ineligibility to continue as a member of the educational community.

4.4.4   Students found responsible for committing dating or domestic violence and/or non-consensual sexual penetration of another person will be subject to a minimum sanction of a one-year suspension, in the absence of significant mitigating factors.  Students found responsible for these acts who have demonstrated predation for the purpose of carrying out these acts will be subject to permanent expulsion.

4.4.5   Member universities must establish guidelines for sanctions and remedies for sexual harassment or sexual misconduct student violations.  These guidelines must be disseminated widely to the university community and utilized in the training of adjudicators and appellate officers.  A model guidelines document, *Model Sanctioning Matrix for Sexual Violence and Sexual Harassment Violations by Students in The Texas A&M University System*, is an appendix to this regulation.  Guidelines adopted by members must be consistent with the *Model Sanctioning Matrix* included in the appendix to this regulation.

4.4.6   Students found responsible for committing acts of sexual harassment, sexual assault, and dating violence, domestic violence, stalking based on sex, and/or any other sex-based misconduct who are allowed to return to a member university after a suspension of one year or more will be ineligible to hold an office in any student organization, ineligible to represent the university in any way (including intercollegiate athletics or other competitions, both on and off campus), and ineligible to receive an institutional scholarship, in the absence of significant mitigating factors.

4.4.7   For other sex-based student conduct rule violations, member universities must establish a process to determine the student's eligibility to represent the university in extracurricular activities, both on and off campus.  The initial determination of eligibility must exclude any administrator who has an inherent conflict of interest in the student's participation in a particular activity (e.g., the coach of a student-athlete, the advisor to a student club or organization).

4.4.8   When an employee is found to have sexually harassed or engaged in sex-based misconduct (as defined by this regulation) another member of the university or agency community, the sanction will be termination of employment.

4.4.9   Universities may not take any disciplinary action against an enrolled student or employee who in good faith reports to the university being the victim of, or a witness to, an incident of sexual harassment, sexual assault, dating violence, or stalking for a violation by the student or employee of the university's code of conduct occurring at or near the time of the incident and reasonably related to the incident, for which suspension, expulsion, or dismissal from the university is not a possible punishment, regardless of the location at which the incident occurred or the outcome of the university's disciplinary process regarding the incident, if any.  This does not apply to a student or employee who reports their own commission or assistance in the commission of sexual harassment, sexual assault, dating violence, or stalking.

4.4.10  For sex discrimination complaints, both the complainant(s) and the respondent(s) will be informed in writing of any and all sanctions, except when to do so would violate state or federal law (e.g., Family Educational Rights and Privacy Act).

4.5   <u>Appeals</u>

4.5.1   <u>Appeal of Decision and/or Sanctions – Allegations of Sex Discrimination</u>.  With respect to allegations of sex discrimination, including sexual harassment and sex-based misconduct, the designated administrator's decision and the sanction(s) imposed by the sanctioning authority can be appealed by the complainant(s) and/or the respondent(s), but only on the following bases, as applicable:

(a)  a procedural irregularity that affected the outcome;

(b) new evidence, not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome.  The new evidence must be provided at the time of appeal with the appropriate member appeals form;

(c) the Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome;

(d) the appropriateness or severity of the sanctions.

4.5.1.1   In order to avoid the appearance of a conflict of interest, appeals on any of these bases must be directed to an authority who had no previous involvement and/or participation in the investigation and/or decision. The appellate authority must be specified in the member's rule, whose decision with regard to the appeal will be final.

4.5.1.2   The appeal will be confined to a review of the written documentation and record of the investigation and/or hearing, and pertinent documentation regarding the grounds for appeal.   The appeal does not create an entitlement to a new investigation or a full re-hearing of the complaint. The appeal process for both the complainant(s) and the respondent(s) must be equitable, but not necessarily identical.   The appeal must be filed within five (5) business days of notification of the decision. The appeals process carries a presumption that the original decision was correct unless a preponderance of the evidence demonstrates that one or more of the conditions of the appeal are met, and that either or both parties was deprived of a fair process.

4.5.1.3   Members must notify the other party in writing when an appeal is filed and implement appeal procedures equitably for both parties.   Parties will be given three (3) business days to review the appeal and submit any written response in support of, or challenging, the outcome to the appellate authority.

4.5.1.4   If the respondent is an employee or third party, the appellate authority will provide a draft decision to OGC for review within five (5) business days after receiving the appeal(s).   OGC will coordinate with SECO and provide its review of the draft decision within five (5) business days. The appellate authority will then have five (5) additional business days to finalize the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously to the extent possible.   If the complaint on appeal is substantiated, the respondent's supervisor will also be informed.   Circumstances may warrant extensions to the timeframes in this section.   The appellate authority should send extension requests, if needed, to the office or individual(s) who appointed them.   Both the complainant(s) and the respondent(s) must be notified of any extensions in writing.

4.5.1.5   For student cases, the appellate authority has ten (10) business days to reach the decision and provide it to the complainant(s), the respondent(s), and the investigative authority simultaneously to the extent possible. Appellate authorities are exempt from obtaining OGC review of the decision prior to issuance but may request assistance from OGC and SECO when needed.

4.5.1.6   The appellate authority may reach one of the following outcomes:

    (a)   affirm the original finding and sanction;

    (b)   affirm the finding and modify the sanction; or

    (c)   remand the case to a new hearing or review.

4.5.2   <u>Appeals – Allegations of Discrimination Not Based on Sex</u>.   Any employee disciplined pursuant to this regulation may appeal that action in accordance with System Policy *12.01, Academic Freedom, Responsibility and Tenure*; System Policy *32.01, Employee Complaint and Appeal Procedures*; System Regulation *32.01.01, Complaint and Appeal Procedures for Faculty Members*; System Regulation *32.01.02, Complaint and Appeal Process for Nonfaculty Employees*; and/or other system policies or regulations as appropriate.

Any student receiving a sanction of separation (expulsion or suspension) pursuant to this regulation may appeal the sanction in accordance with the member rule and/or code of conduct for student grievances.

4.5.3   Employees appealing sanctions issued pursuant to this regulation will receive an unredacted copy of the investigation report and exhibits, upon request, with admonishments regarding privacy.

4.6   <u>Informal Resolution</u>

4.6.1   At any time prior to the determination of a final decision, the parties may seek informal resolution to resolve the complaint.   The following conditions apply to informal resolution:

(a) Informal resolution is a voluntary process.   No party may be compelled to participate in informal resolution.   The system member, in consultation with SECO, must agree to allow an informal resolution to move forward and must obtain the parties' voluntary, written consent to the informal resolution process.

(b) Prior to an informal resolution, the parties will be provided with: (a) written notice of the allegations; (b) the requirements of the informal resolution process, including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations; and (c) the consequences of withdrawing from the informal process and resuming the formal process, and including the records that will be maintained or could be shared.

(c) Once a party agrees to participate in informal resolution, they may withdraw from the process at any time prior to a final agreement and resume the formal grievance process. Information shared in the informal resolution process may not be introduced into the formal process without independent evidence.

(d) Once a final agreement is established through informal resolution, the complaint may not return to the formal complaint process unless one or both parties fails to abide by any conditions established in the agreement.

(e) Informal resolution options include mediation, restorative conferences, shuttle facilitation, and other forms of facilitated dialogue.  Each member must work in consultation with SECO in developing informal resolution programs and the conditions for their use.

(f) Mediation may not be used to resolve complaints of rape, statutory rape, dating violence, domestic violence, or any case in which imminent threats of harm may exist.

(g) Members may not offer an informal resolution process in sex-based complaints unless a formal complaint is filed and may not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student.

## Related Statutes, Policies or Requirements

Family Educational Rights and Privacy Act (FERPA)

The Equal Pay Act of 1963

Title VII of the Civil Rights Act of 1964, as amended

The Age Discrimination in Employment Act of 1967

The Age Discrimination Act of 1975

Title IX of the Education Amendments of 1972

The Rehabilitation Act of 1973, as amended

 Americans with Disabilities Act of 1990, as amended

The Genetic Information Nondiscrimination Act of 2008

Executive Order 11246, as amended

Executive Order 13672

Texas Commission on Human Rights Act

Texas Fair Housing Act

Tex. Educ. Code 51 Subchapter E-2, Reporting Incidents of Sexual Harassment, Sexual Assault, Dating Violence, and Stalking

Tex. Educ. Code § 51.9363, Sexual Assault Policy

Tex. Educ. Code § 51.9365, Electronic Reporting Option for Certain Offenses

Tex. Educ. Code § 51.9366, Amnesty for Students Reporting Certain Incidents

Tex. Lab. Code, Ch. 21, Employment Discrimination

System Policy *08.01, Civil Rights Protections and Compliance*

System Policy *12.01, Academic Freedom, Responsibility and Tenure*

System Policy *32.01, Employee Complaint and Appeal Procedures*

System Regulation *32.01.01, Complaint and Appeal Procedures for Faculty Members*

System Regulation *32.01.02, Complaint and Appeal Process for Nonfaculty Employees*

This regulation supersedes:

> System Regulation *33.02.01, EEO and Affirmative Action Programs*
>
> System Regulation *33.02.02, Compliance with Employment Provisions of the Americans with Disabilities Act*
>
> System Regulation *34.01.01, Sexual Harassment*

---

## Appendix

---

*Model Sanctioning Matrix for Sexual Violence, Sexual Harassment, and Sex-based Misconduct by Students in The Texas A&M University System*

*Minimum Training Requirements for Civil Rights Investigations, Advisement, Adjudication, Appeals, and Informal Resolution in The Texas A&M University System*

---

## Member Rule Requirements

---

A rule is required to supplement this regulation. See Section 1.4.

---

## Contact Office

---

System Ethics and Compliance Office
(979) 458-6203

# Exhibit 3



## STANDARD ADMINISTRATIVE PROCEDURE

**08.01.01.M1.01**       **Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees, and Third Parties**
*Approved January 23, 2013*
*Revised August 6, 2019*
*Next scheduled review: August 6, 2024*

---

### SAP Statement

---

The purpose of this SAP is to identify the procedures the University will use when responding to reports or complaints of Prohibited Conduct against students, employees, or third parties.

---

### Definitions

---

The definitions from *TAMU Rule 08.01.01.M1*, including the definition of "Prohibited Conduct," are incorporated by reference as if fully set forth herein.

---

### Procedures and Responsibilities

---

1.      ROLES AND RESPONSIBILITIES

   1.1      The **Department of Civil Rights and Equity Investigations (CREI)** has been designated to receive and investigate all reports alleging Prohibited Conduct against Students, Employees, and Third Parties. CREI is responsible for appointing the Investigative Authority.

   Reports that a Student, Employee or a Third Party has engaged in Prohibited Conduct should be made to CREI by contacting the **Assistant Vice President and Title IX Officer**, Medical Sciences Library, 202 Olsen Blvd, Suite 007, College Station, TX  77843.  Reports may also be made by calling (979) 458-8407 or emailing [civilrights@tamu.edu](mailto:civilrights@tamu.edu).  The Assistant Vice President and Title IX

Officer's responsibilities include (1) overseeing the process of responding to allegations of Prohibited Conduct and (2) identifying and addressing any patterns or systemic problems that arise from the review of such complaints.

1.2     The **Investigative Authority (IA)** is one or more trained individuals appointed to conduct a formal investigation to discover and examine the facts related to an allegation.   The IA may also draw conclusions as to whether, based on the preponderance of the evidence, an allegation is substantiated, unsubstantiated, or that there is insufficient information to substantiate. The IA may also draw conclusions as to whether or not any other regulations, codes, policies, rules or SAPS were violated.

1.3     The **Designated Administrator (DA)** reviews the Investigation Report, the documentary evidence, and any other relevant information and renders a written decision of responsibility based on the preponderance of the evidence as to 1) whether the conduct alleged occurred; and 2) whether each allegation has been substantiated, unsubstantiated, or that there is insufficient information to substantiate that Respondent violated *Texas A&M System Regulation 08.01.01*. The DA may also render a written decision as to whether other regulations, codes, policies, rules or SAPS were violated.  If violation(s) are found, the DA may issue sanctions.

   1.3.1   The University's Chief Risk, Ethics, and Compliance Officer will appoint a **Hearing Officer** to be the DA for all allegations against students.

   1.3.2   The University's Chief Risk, Ethics, and Compliance Officer will appoint an individual to be the DA for all allegations against non-faculty Employees and Third Parties, except that the Chancellor or designee will serve as the DA for complaints against the Texas A&M President and for any employee who reports directly to the President.

   1.3.3   **The Dean of Faculties and Associate Provost** or designee will be the DA for all allegations against Faculty Employees, except that the President or designee will be the DA for allegations made against the Dean of Faculties and Associate Provost.

1.4     If the Complainant or the Respondent appeals the DA's decision, the **Appellate Authority (AA)** will review the Investigation Report, The DA's decision, the documentary evidence, and any other relevant information and render a written decision on the appeal.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **2** of 24

1.4.1 <u>Appeals of decisions based on allegations against Students</u>:
The AA for appeals of decisions based on allegations against students is the University Disciplinary Appeals Panel (UDAP) and the appeal will follow the procedure outlined in *Section 6* below and *Student Rule 58*. UDAP may refer the appeal to the Dean of Student Life or designee.

1.4.2 <u>Appeals of decisions based on allegations against Non-faculty Employees and Third Parties</u>:
The AA for Non-faculty Employees and Third Parties will be the Vice President for the Division of Human Resources and Organizational Effectiveness or designee. The appeal will follow the procedure outlined below in *Section 6* below and *Texas A&M SAP 32.02.02.M0.02*.

1.4.3 <u>Appeals of decisions based on allegations against Faculty</u>:

The AA for Faculty Employees will be:
1) The **University Committee on Faculty Disciplinary Appeals (UCFD)** who will render an advisory opinion regarding the appeal to the Provost and Executive Vice President; and,
2) The Provost and Executive Vice President will render a final decision.

The appeal will follow the procedure outlined in *Section 6* below and in *University Rule 12, Faculty.*

1.5 All persons serving as DAs, AAs, and IAs, will receive annual training regarding the University's rules and procedures and the handling of civil rights investigations, including Title IX investigations. The IA will receive additional annual training in regards to conducting fair and impartial investigations, including trauma-informed investigation techniques and due process protections.

1.6 All persons serving as DAs, AAs, and IA's will be impartial and free of conflicts of interest. Parties who are concerned about the impartiality of an individual serving in one of these roles should submit their concerns, in writing, to the Chief Risk Ethics and Compliance Officer, who may designate alternative individuals to fulfill any of these roles. If the concern is in relation to the Chief Risk Ethics and Compliance Officer serving in one of the capacities, the Executive Vice President for Finance and Operations and CFO will have the option of designating a replacement.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **3** of **24**

2. **PROCEDURES FOR INITIAL REVIEW AND PRELIMINARY ASSESSMENT OF REPORTS AND/ OR COMPLAINTS**

2.1   CREI will conduct an initial review of all reports and/or complaints of alleged Prohibited Conduct that are received by the University against Students, Employees, or Third-Party Respondents. The purpose of the review is to: 1) assess the safety and well-being of the Complainant, the Respondent, and the community, and 2) to determine whether a potential violation of *Texas A&M System Regulation 08.01.01* or other University rule, SAP, code or policy could have occurred.  As part of the review, CREI will take the following steps:

Within five (5) business days of receiving a report or complaint, or as soon as reasonably practicable thereafter, CREI will attempt to meet with the Complainant to obtain more information about the allegations and to assess the safety and well-being of the Complainant, the Respondent and the community.  CREI will:

- Inform the Complainant about their rights, resources, and options, including options for medical treatment, counseling, and other support services. Provide the Complainant with written information about University and community resources that individuals who experience Prohibited Conduct are entitled to receive regardless of whether they choose to pursue informal, formal, or criminal remedies.
- Inform the Complainant of their right to file a complaint with law enforcement (if applicable) in addition to filing a complaint with CREI. Inform the Complainant of their right to decline to contact law enforcement. Offer to assist the Complainant with notifying law enforcement if desired.
- Inform the Complainant of their right to file a complaint with state and federal agencies.
- In coordination and consultation with other University officials, offer the Complainant the opportunity to request interim supports, academic adjustments, and protective measures, as applicable. See *2.2 below*.
- If applicable, advise the Complainant about the importance of preserving evidence that could assist in the investigation.
- Inform the Complainant about formal resolution under this SAP and solicit the Complainant's preferred method for resolving the matter.
- Inform the Complainant about the University's prohibition against retaliation.
- Offer to assist the Complainant in submitting a written complaint that details the nature and circumstances of the allegations, including the names of the Complainant(s) and the Respondent(s), if so inclined.
- If applicable, inform the Complainant of the right to use a pseudonym in University documents related to the complaint. *See Section 3.2 below*.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **4** of **24**

- Determine whether the Complainant is a minor, elderly, or disabled and, if required, contact the appropriate agency in accordance with Texas law.
- Consider whether requesting an interim suspension or interim restriction (for Student Respondents) or an interim administrative action such as a leave of absence (for Employees) would enhance the safety and well-being of the Complainant, the Respondent, or the University community.  See *Section 8.*
- Report de-identified statistics in accordance with University policies for Clery Compliance purposes, if required.

2.2     **The University** offers a range of support services, academic adjustments, and protective measures to employees, students, and third parties. The purpose of these measures is to:

    1) facilitate continued access to University employment, academic programs, and University activities;

    2) stop and prevent the reoccurrence of Prohibited Conduct;

    3) support the Complainant and the Respondent during the investigation and resolution process.

Contacts for obtaining information about counseling, medical, mental health, victim advocacy, visa and immigration information, impact of a leave of absence on student financial aid, and other services available to Complainants and Respondents (on campus and in the community) are available here:

    Rights, Resources, and Options for Complainants
    Rights, Resources, and Options for Respondents

Support services, academic adjustments, and protective measures may be available to both Complainants and Respondents on a temporary or permanent basis, subject to periodic review. These measures may include, but are not limited to: no-contact directives, academic accommodations (e.g., dropping a class or postponing a due date, for example), work schedule or location changes, transportation modifications, residential moves, and leaves of absence. These measures may be available regardless of whether a Complainant pursues a formal or informal remedy under this SAP. The University will maintain the privacy of a person receiving support services, academic adjustments, or protective measures provided under this SAP to the extent practicable and will promptly address any violation of the protective measures.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **5** of **24**

Additionally, the University will notify the parties that options such as protective orders and criminal trespass warnings may be available through law enforcement agencies and the judicial system.

If a Complainant, Respondent, or other member of the University community has obtained a protective order, civil no-contact order, restraining order, or similar order from an appropriate court against another member of the University community, a copy of the order should be provided to the Chief Risk, Ethics, and Compliance Officer. In conjunction with the University Police Department (UPD) and other University officials, the Chief Risk, Ethics, and Compliance Officer will take all reasonable actions authorized by law to implement the order.   For more information about how to obtain a protective order in the state of Texas, please consult:  https://guides.sll.texas.gov/legal-forms/protective-orders.

The University will provide reasonable interim, remedial, and protective measures to Third Parties as appropriate and available, taking into account the role of the Third Party and the nature of any contractual relationship with the University.

2.3     Complainant may request a formal resolution of allegations of Prohibited Conduct or may request "no resolution" of the allegations of Prohibited Conduct.

   2.3.1   The allegations will be considered for investigation pursuant to the procedures set forth in *Section 3* below.  CREI reserves the right to resolve a complaint through no resolution rather than a formal investigation if the allegation does not rise to the level of Prohibited Conduct.

   2.3.2   If the Complainant requests that no resolution of the allegations occur, the University will seek to honor the request whenever possible without impeding the University's ability to enhance the safety and security of the Complainant and the University community.   CREI will consider the following factors when evaluating such requests:

   - All of the known circumstances, including any corroborating evidence;

   - The nature and scope of the alleged conduct, including whether the reported behavior involves the use of a weapon;

   - The respective ages and roles of the Complainant and Respondent;

   - Whether there have been other reports of Prohibited Conduct or other misconduct by the Respondent;

   - Whether the report reveals a pattern of misconduct related to prohibited conduct (e.g. via illicit use of drugs or alcohol) at a given location or by a particular group;

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **6** of **24**

- Fairness considerations for both the Complainant and the Respondent;
- Whether the University possesses other means to obtain relevant information and evidence;
- The University's obligation to provide a safe and non-discriminatory environment;
- Any admissions of responsibility by the Respondent, if any; and,
- The impact of honoring the request on the Complainant and the University Community, including the risk of additional violence.

2.3.3 If the University is able to honor the Complainant's request for no resolution, the University may close the matter with no action taken, or the University may proceed, with other appropriate steps, including investigation and disciplinary action against the Respondent for violations of other rules, SAPS, regulations, policies or codes, if applicable.

If the University determines that the Complainant's request cannot be honored, the Complainant will be notified of the decision, and CREI will take appropriate actions, including but not limited to: (1) offering support services or academic adjustments and imposing protective measures; and (2) initiating a formal investigation.

2.4 Within five (5) business days of the receipt of a report, or as soon as practicable thereafter, CREI may consult with the Texas A&M University System Office of General Counsel (OGC) as needed and make a preliminary determination about whether to conduct a formal investigation of the allegations. The preliminary determination may include, but is not limited to, the following:

(a) An assessment of whether there is sufficient known or obtainable information to proceed with an investigation of the complaint;

(b) An assessment of whether the allegations are baseless;

(c) An assessment of whether the allegations, if true, would constitute Prohibited Conduct; and/or

(d) An assessment of whether a Complainant's request for no resolution may be honored.

If it is determined that there is insufficient information to proceed with an investigation; or that the allegations are baseless; or, that the allegations, if true, would not constitute Prohibited Conduct; or that an investigation will not occur due

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **7** of **24**

to Complainant's request for no resolution, CREI may, after consultation with OGC:

    a.    Dismiss the complaint; or

    b.    may refer the report to a different office at the University who may review the conduct and take disciplinary action against the Respondent for violations of other University rules, codes, regulations, policies, or SAPS, if applicable.

2.5    If a complaint alleges conduct that may be Prohibited Conduct as well as a violation of one or more rules, SAPs, regulations, codes, or policies, CREI will consult with other University Officials, as appropriate, and coordinate procedures to utilize to resolve the allegations in addition to those required by this SAP. CREI may elect to resolve all the allegations in one proceeding under this SAP, or CREI may elect to refer one or more of the allegations to other university administrators for resolution apart from this SAP.

3.    FORMAL INVESTIGATION OF COMPLAINTS

3.1    Once it has been determined that the University will proceed with a formal investigation, CREI will appoint the Investigative Authority (IA). The IA may include one or more appropriately trained investigators.

3.2    Within two (2) business days of the IA's appointment, the Assistant Vice President and Title IX Officer (or designee) shall simultaneously notify the Complainant(s) and Respondent(s) in writing of the commencement of the investigation. The notice will include: (1) the identity (or pseudonym, if requested and applicable) of the Complainant and the Respondent; (2) the date, time (if known), location, and nature of the alleged misconduct; (3) the regulation(s), policies(s), rules(s), SAP(s) or code(s) alleged to have been violated and a copy of this SAP; (4) the identity of and contact information for the IA; (5) the identity of the DA and AA; (6) an explanation of the prohibition against retaliation; (7) an instruction to the parties to preserve any potentially relevant evidence in any format; (8) information about the University's process for challenging the neutrality or bias of the IA, DA, or AA; and (9) a redacted copy of the written complaint, if any, with appropriate admonishments about privacy. If the Complainant has requested that a pseudonym be used in the University's paperwork, the Respondent will be verbally notified of the Complainant's name at the Respondent's intake meeting. The Notice will also include an assurance that the parties will be kept apprised of the status of the investigation and resolution process and provide a contact person for the party to contact for periodic update.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **8** of **24**

3.3     If the Respondent is an employee, the Assistant Vice President and Title IX Officer (or designee) shall also notify, in writing, the Respondent's department head that CREI is investigating an allegation that the Respondent has engaged in conduct that may be a violation of *Texas A&M System Regulation 08.01.01* or other University rules, SAPS, codes, or policies.

3.4     The IA will review the complaint, conduct a prompt, fair, thorough and impartial investigation, and provide a draft investigative report for OGC review within approximately thirty (30) business days from the issuance of the Notice of Investigation. Circumstances may warrant extensions to this timeframe.

3.5     Abuse of the investigation and resolution process is subject to disciplinary action up to and including dismissal or separation from the University. Examples of abuse of process include, but are not limited to:

- Failure to appear at a meeting, interview, hearing, or conference as set forth in a Notice issued by CREI
- Falsification, distortion, destruction, or misrepresentation of evidence or information
- Disruption or interference with the orderly conduct of an investigation, interview, meeting, hearing or conference
- Intentionally initiating or causing to be initiated a false report
- Attempting to discourage an individual's proper participation in, or use of, the investigation and resolution process, disciplinary process, or legal process
- Attempting to influence the impartiality of the IA, AA, or DA prior to, and/or during the course of, the investigation and resolution process
- Verbal or physical intimidation, and/or retaliation of any party to the investigation and resolution process prior to, during, and/or afterwards.
- Failure to abide by the terms of University administered sanctions.
- Influencing or attempting to influence another person to commit an abuse of the investigation and resolution process
- Failure to cooperate fully with the IA (applies to employees only)

Students, Employees, and Third Parties who are found responsible for abuse of the investigation and resolution process are subject to the sanctions outlined in *Section 5* of this SAP.

3.6     During the investigation, the Complainant and the Respondent will have an equal opportunity to be heard, to submit information and corroborating evidence, to identify witnesses who may have relevant information, and to submit questions to be asked of the other party. Questions for the other party will be asked by and at

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **9** of **24**

the discretion of the IA. The IA will meet separately with the Complainant, the Respondent, and any witnesses, and will gather other relevant and available evidence and information.   The IA may also consult medical, forensic, technological, or other experts when expertise is needed in order to achieve an understanding of the issues under investigation.

3.7     Witnesses must have observed the acts in question or have information relevant to the incident in order to participate in the process.  A witness cannot participate solely to speak about an individual's character. However, a Respondent may provide letters or other written testimonials to the investigator that include information about Respondent's character, which will be provided to the DA after a decision on responsibility has been made but before sanctions (if any) are considered.

3.8     When the University is made aware that there is a concurrent criminal investigation, CREI may inform the law enforcement agency that a University investigation is also in progress; ascertain the status of the criminal investigation; and, determine the extent to which any evidence collected by law enforcement may be available to the University in its investigation.

At the request of law enforcement, the University may temporarily defer part or all of the investigation until after the initial evidence-gathering phase of the law enforcement investigation is complete. The IA will communicate with the parties (as appropriate) about the law enforcement agency's request; the University's obligations and supportive resources; procedural options; anticipated timing; and the implementation of any necessary interim measures for the safety and well-being of all affected individuals.

3.9     Standards for the resolution of criminal allegations are different than the standards for resolution of a violation of *Texas A&M System Regulation 08.01.01* and/or any other University policy, rule, SAP, or code; therefore, the University will not base its decisions under this SAP on any law enforcement determination and/or the outcomes of any criminal proceedings.

3.10    The IA has the sole discretion to determine the relevance of evidence and whether it should be included in or excluded from the Investigation Report.  If applicable, the Hearing Officer has the sole discretion to determine the relevance of evidence and whether it should be heard at a live hearing.  The Rules of Evidence do not apply in a live hearing.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **10** of **24**

3.11    With respect to allegations of Prohibited Conduct based on sex or gender: the sexual history of the Complainant or Respondent is generally irrelevant and will not be used to prove character or reputation. Sexual history of the parties may be relevant in limited circumstances, such as when it aids in determining the manner and nature of prior communications of consent between the parties.

3.12    CREI is responsible for all administrative actions required to conduct the investigation. These include, but are not limited to, informing the parties of extensions or other delays affecting the investigation, contacting supervisors or faculty regarding their employees' or students' time away from work or class to participate in the investigative process, making reports to university administrators, and other responsibilities necessary to properly conduct the investigation.

3.13    To the extent possible, the investigation will be conducted in a manner that protects the privacy of all parties involved. While the University cannot guarantee complete privacy, information collected during the investigation will be communicated only to the parties and those with a need to know in order to fulfill the purposes of University policies and to comply with applicable laws.

3.14    Both the Complainant and the Respondent have the right to choose an advisor to be present at any time in which the party participates in the investigation and resolution process, including the filing of the complaint, the interview with the IA, and all other meetings related to the investigation and resolution of the complaint. The advisor may be any person selected by a party, including legal counsel, except that the advisor may not be another party or a witness in the case. The advisor's participation will be limited to the role of an observer, although the advisor may request a break at any point to give advice to a party. An advisor can be barred from being present during the process if, in the judgment of the IA, the DA, the AA, or the Assistant Vice President and Title IX Officer, the advisor attempts to directly address the IA, DA or AA, advocate on behalf of a party, or is otherwise disruptive. Any fees charged by the advisor are the responsibility of the individual who selected the advisor.

3.15    At the conclusion of the investigation, the IA will prepare a Draft Investigation Report summarizing the relevant information gathered and outlining any relevant contested and uncontested information. The Draft Investigation Report will not include any conclusions as to whether allegations are substantiated, unsubstantiated or that there is insufficient information to substantiate.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **11** of 24

The Complainant and the Respondent will be notified that the Draft Investigation Report is complete and will be given five (5) business days to review the Draft Investigation Report and submit a written response to the IA. CREI may extend the time to review the Draft Investigation Report upon request for good cause. If one party is granted an extension of time to review the report, an equal amount of additional time will be granted to all other parties.

In cases that include allegations against a Student Respondent, the exhibits to the Draft Investigation Report may be reviewed by the parties upon request. In cases that include allegations against an Employee or Third Party Respondent, all parties may review the Exhibits to the Investigation Report without making a request.

Involved parties have the opportunity to review and respond to the Draft Investigation Report by: (1) providing written comment or feedback; (2) submitting additional evidence or information; (3) identifying additional witnesses or requesting the collection of other information by the Investigative Authority; and/or (4) suggesting questions to be asked (at the discretion of the IA) of the other party(ies). A party's written response, if any, will be shared with all other parties and incorporated in the investigation report as an exhibit. If a party knows, or through the exercise of reasonable diligence, should know, of information or evidence that was not provided to the investigator during the investigation, the party must provide such information or, if the party does not have access to the information, a description of such evidence to the IA during the review and respond period or such evidence will not be considered, absent good cause, in the determination of responsibility for a violation of a regulation, rule, SAP, code or policy.

3.16    At the conclusion of the review and respond period, the IA will determine if any new or relevant information was provided by one or both of the parties. If necessary, the IA may pursue additional investigative steps and/or amend the Investigation Report. If the amended Investigation Report contains any material or substantial changes, the Complainant and Respondent will be given five (5) business days to review the amended Investigation Report and submit a written response as set forth above. The opportunity to review and respond to an amended Investigation Report will be extended to the Complainant and Respondent until the IA determines that no material or substantial changes were made to the Draft Investigation Report.

The IA may add a conclusion for each allegation to the Investigation Report after the final review and response period concludes. The conclusion will be:

substantiated, unsubstantiated, or insufficient information to substantiate based on the evidence and information in the report. In addition, the IA may add a conclusion as to whether *Texas A&M System Regulation 08.01.01* was violated, and, if appropriate, the IA may make a conclusion as to whether other regulations, policies, rules, SAPS, or codes were violated. The IA will use the preponderance of the evidence standard (i.e., more likely than not) in making conclusions. The IA will not make any recommendations or conclusions with respect to sanctions.  The conclusions of the IA are merely advisory and are not the final decision with respect to responsibility.

Within five (5) business days after the final review and respond period concludes, CREI will forward the Investigation Report, as amended with conclusions (if applicable), along with the documentary evidence and any other relevant information, to the Office of General Counsel (OGC). OGC will conduct a legal review in accordance with *Section 4.2.5 of System Regulation 08.01.01*. OGC will provide its legal review to the IA within ten (10) business days. After receiving the legal review, the IA will have five (5) business days to finalize the Investigative Report.  The Assistant Vice President and Title IX Officer (or designee) will submit the final report directly to the DA for decision-making.  In cases that involve a student Respondent, all parties will receive an electronic copy of the Final Investigation Report (which does not include conclusions or exhibits) at the time the report is sent to the DA.  Exhibits may be reviewed upon request in CREI's office.

4.      THE DESIGNATED ADMINISTRATOR'S DECISION

4.1     The Respondent is presumed to not have engaged in Prohibited Conduct until the DA finds that there is sufficient evidence based on a preponderance of the evidence to find that Respondent has violated *Texas A&M System Regulation 08.01.01* or *Texas A&M Rule 08.01.01.M1 Prohibited Conduct: Discrimination, Harassment, Complicity, and Related Retaliation based on a Protected Characteristic.*

**Procedures Governing 1) Non-separable Allegations against Students,[1] and**
**2)  All Allegations against Employees and Third Parties**

---

[1] A "non-separable allegation" is an allegation that a student engaged in conduct that 1) does not carry a possible sanction of suspension or expulsion as per the Texas A&M Student Sanctioning Matrix, OR 2) has been determined by the Assistant Vice President and Title IX Officer to not be serious enough that, if true, a possible sanction of suspension or expulsion would be appropriate.

4.2     A decision by the DA of responsibility does not constitute an employment action with respect to faculty and non-faculty employees.  Any sanction, imposed as a result of a substantiated finding, will constitute an employment action.

4.3     The DA will (1) review the unredacted Final Investigation Report, the documentary evidence, and any other relevant information; and, (2) draft a decision based on the preponderance of the evidence as to a) whether the alleged conduct occurred; and b) whether each allegation is substantiated, unsubstantiated, or there is insufficient information to substantiate that the Respondent violated System Regulation 08.01.01.  The DA may also decide whether the Respondent has violated any other System regulations or University rules, SAPS, codes and policies.  If any violations of *Texas A&M System Regulation 08.01.01* are substantiated, the draft decision will include sanctions.  The draft decision may also include sanctions for substantiated violations of regulations, rules, SAPS, codes, and policies. Sanctions should be determined in accordance with *Section 5* below.

In the decision, the DA will state the rationale for the decision and the sanctions, if any. The decision will also include an explanation of how the University weighted the evidence as well as how the standard of proof was applied. The final decision will include instructions for appealing the decision and/or sanctions.

If the DA has substantial doubts about the thoroughness, fairness, and/or impartiality of the investigation, the DA may refer the matter back to the IA with further instructions, which could include the appointment of a different IA.

4.4     Within five (5) business days of the DA's receipt of the Final Investigation Report, the DA will forward its draft decision to OGC. Within five (5) business days of OGC's receipt of the draft decision, OGC will conduct a legal review in accordance with S*ection 4.4.1 of System Regulation 08.01.01* and consult, as needed, with respect to sanctioning.  Once the DA receives OGC's legal review, the DA will then have five (5) business days to finalize the decision and 1) forward Notice of the DA's decision simultaneously to the parties and the IA as set forth in Section *4.7* below; and 2) in cases that involve an employee Respondent, simultaneously notify the parties of their right to review a copy of the Final Investigation Report, with conclusions and the exhibits, after receiving admonishments as to privacy and retaliation.

4.5     The Final Investigation Report will be redacted in accordance with state and/or federal law before the parties' review.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **14** of **24**

**Procedures Governing Separable Allegations[2] against Students**

4.6     The DA will (1) review the unredacted Final Investigation Report, the documentary evidence, and any other relevant information; and, (2) conduct a live hearing to allow the parties to present witnesses, evidence or information, and to cross-examine the other parties or witnesses by submitting written questions to the DA (questions will be asked by and at the discretion of the DA). Thereafter, the DA will announce a decision, based on the preponderance of the evidence, as to whether or not the alleged conduct occurred; and b) whether it is substantiated, unsubstantiated, or there is insufficient information to substantiate that the Respondent violated *Texas A&M System Regulation 08.01.01*.  The DA may also announce a decision as to whether Respondent violated any other University regulation, code, policy, SAP or rule.  .

If the DA determines that any regulations, policies, rules, SAPs, or codes have been violated, the DA will conduct a second hearing on sanctions immediately following the first hearing.  The DA will receive information about the factors listed in *Section 5.1* below and accept any impact or mitigation statements as well as any information about the Respondent's character.

Thereafter, the DA will notify the parties in writing of the decision on responsibility and sanctions as set forth in *Section 4.7* below.  The final decision will include information about appealing the decision.

The decision of the DA will include how the University weighted the evidence and the information contained within the Investigation Report. The DA will also state how the standard of proof was applied.

4.7     With respect to an allegation involving Prohibited Conduct based on sexual harassment, sexual assault, sexual exploitation, dating abuse/violence, domestic abuse/violence, or stalking based on sex or gender, the DA will simultaneously notify the parties, the IA, and any other University official with a need to know of the decision on the allegation and/or sanctions, except when doing so would violate state or federal law (e.g., Family Educational Rights and Privacy Act).  The DA will also notify the parties that they can review the Final Investigation Report, with conclusions and exhibits, in CREI's office.

---

[2] A "separable allegation" is an allegation that 1) a student Respondent engaged in Prohibited Conduct or other violation of System regulations or University policies that carries a possible sanction of suspension or expulsion as per the Texas A&M Student Sanctioning Matrix, or 2) the Assistant Vice President and Title IX Officer has determined to be serious enough, if true, a sanction of suspension or expulsion would be appropriate.

If the allegations involve Prohibited Conduct other than sexual harassment, sexual assault, sexual exploitation, dating abuse/violence, domestic abuse/violence, stalking, or related retaliation, the DA will simultaneously notify: (1) the Complainant that an investigation of the allegations was conducted and the matter has been resolved appropriately; and (2) the Respondent, the IA, and any other University official with a need to know, of the decision and/or sanctions.  The DA will also notify the parties that they can review the Investigation Report with conclusions (if applicable) and exhibits in CREI's office.

5.    SANCTIONING

5.1    In determining the appropriate sanctions, many factors may be considered, including but not limited to:

- The expressed wishes of the Complainant(s);
- The nature of the Prohibited Conduct;
- The impact of the conduct on the Complainant(s);
- The impact of the conduct on the University community and the need to protect the safety of the University community;
- Prior disciplinary history of the Respondent;
- Whether the Respondent has accepted responsibility for the conduct;
- The necessity of any specific action in order to eliminate the Prohibited Conduct, prevent its recurrence, and remedy its effects on the Complainant(s) or other University community members; and/or
- Any other mitigating, aggravating, or compelling circumstances.

### SANCTIONING FOR EMPLOYEES

5.2    If an employee is found to have sexually harassed[3] another member of the university or agency community, the sanction will be termination of employment.

If an employee is found to have engaged in Prohibited Conduct other than sexual harassment, the DA may assign appropriate sanction(s) which may have educational, restorative, punitive, and rehabilitative components. Examples of sanctions may include, but are not limited to, written warning or reprimand, required training and/or attendance at counseling, "no contact" restrictions, probation, suspension, and termination.

If the employee is found responsible for violating any other rule, policy, SAP, code, or regulation, the DA may assign appropriate sanction(s) or may refer the sanctioning to any other appropriate university administrator.

---

[3] Sexual Harassment is defined in *Texas A&M System Regulation 08.01.01*.

# SANCTIONING FOR STUDENTS

5.3     If a student is found responsible for sexual harassment, sexual assault, domestic abuse/violence, dating abuse/violence, stalking based on sex or gender, or sexual exploitation, the student will be sanctioned in accordance with the Student Title IX Cumulative Sanctioning Matrix.

If a student is found responsible for engaging in any other form of Prohibited Conduct, or if the student is found responsible for violating any other University Rule or System regulation, the DA will assign appropriate sanctions which may have educational, restorative, and rehabilitative components.

Student Sanctions include:

5.3.1   *Expulsion*: Separation of the student from the University whereby the student is not eligible for readmission to this University.

5.3.2   *Suspension*: Separation of the student from the University for a definite period of time. The student is not guaranteed readmission at the end of such period of time, but is guaranteed a review of the case and a decision regarding eligibility for readmission. The suspension takes effect when the appeal for the offense is exhausted, waived or time limit has passed.  Suspensions may be implemented in one of two ways:  immediate implementation of suspension or deferred implementation of suspension. The sanction of suspension may be placed in deferred status. If the student is found in violation of any University rule during the time of deferred suspension, the suspension takes effect immediately without further review. Additional student conduct sanctions appropriate to the new violation also may be applied. A student who has been issued a deferred suspension sanction is deemed "not in good standing" with the University.

**Not in good standing:** A student who is not in good standing is subject to the following restrictions:

- Ineligibility to hold an office in any student organization recognized by the University or to hold any elected or appointed office of the University.
- Ineligibility to represent the University in any way, including representing the University at any official function, intercollegiate athletics or any forms of intercollegiate competition or representation. This includes events taking place both on and off of the University campus.
- Ineligibility to receive a University administered scholarship when the length of the period of not in good standing is greater than one semester. Some scholarships adhere to more strict guidelines, and, therefore, ineligibility may result from a lesser length of not in good standing. This sanction implies a serious offense and must be uniformly applied by the office administering the scholarship upon notification by CREI.

- Additional restrictions or conditions also may be imposed, depending on the nature and seriousness of the misconduct.

At the end of the suspension period, the student is eligible for reenrollment. Actual admission to the University will be determined by the academic rules in place at the time of application for reenrollment.

5.3.3. *Conduct Probation*: An official warning that the student's conduct is in violation of Texas A&M University regulations, policies, rules, codes, or SAPs, but is not sufficiently serious to warrant expulsion or suspension. A student on conduct probation is deemed "not in good standing" with the University. If there is a finding of responsibility for subsequent violations of the University's regulations, policies, rules, codes, or SAPS during this period of time, more severe sanctions may be administered.

5.3.4. *Conduct Review:* An official warning that the student's conduct is in violation of Texas A&M University regulations, policies, rules, codes, or SAPs, but is not sufficiently serious to warrant expulsion, suspension, or conduct probation. A student on conduct review shall have their conduct under review for a specified period of time. This sanction may require regular meetings with an appropriate official to ascertain and evaluate compliance with student rules. Additional restrictions or conditions also may be imposed, depending on the nature and seriousness of the misconduct. Students placed on this sanction remain in good standing with the University. If there is a finding of responsibility for subsequent violations of regulations, policies, rules, codes, or SAPs during this period of time, more severe sanctions may be administered.

5.3.5. *Restrictions*: The withdrawal of specified privileges for a definite period of time, but without the additional stipulations contained in the imposition of a sanction which results in a student being not in good standing. The restrictions involved will be clearly defined.

5.3.6. *Restitution*: A payment for financial injury to an innocent party in cases involving theft, destruction of property or deception. The assessed costs to be paid may be in addition to receipt of any of the above sanctions.

5.3.7. *Community/University Service*: A student may be offered an opportunity to complete a specified number of hours of Community/University Service. The type of Community/University Service must be approved by the Respondent's CREI Case Manager.

5.3.8. *Educational Requirements*: A provision to complete a specific educational requirement. Such educational requirements may include, but are not limited to, completion of an alcohol education workshop, a diversity awareness workshop, essays, reports, reflective writing assignments, etc.

5.3.9. *Letter of Enrollment Block*: A letter stating that the student may not reenter Texas A&M University without prior approval through the Offices of the Dean of Student Life or the Vice President for Student Affairs if enrollment has been blocked for a previous student conduct problem.

5.3.10. *Letter of Reprimand*: A letter that makes a matter of record any incident that reflects unfavorably on the student or the University.

5.3.11 Campus Housing Sanctions:

The occupants of each residence hall, by majority vote, have the power to establish additional "in house" rules as approved by the Department of Residence Life. Generally, "in house" rule infractions are handled by resident life staff.

5.3.11.1 *Loss of Campus Housing Privilege*: Removal from university housing for conduct reasons.

5.3.11.2 *Deferred Loss of Campus Housing Privilege*: The sanction of Loss of Campus Housing Privilege may be placed in deferred status. If a student is found in violation of any University rule during the time of the deferred sanction, removal from housing takes effect immediately without further review. Additional student conduct sanctions appropriate to the new violation also may be taken. In addition, a student is ineligible to hold an elected or appointed office in any affiliated housing organization.  This includes but is not limited to the following offices/positions:  president, vice president, secretary, treasurer, RHA delegate.

5.3.11.3 *Campus Housing Probation*: An official notice that the student's conduct is in violation of residence hall rules, University Apartments rules and/or University rules and that more stringent student conduct sanctions, including removal from housing, may result if future violations occur. In addition, a student is ineligible to hold an elected or appointed office in any affiliated housing organization. This includes but is not limited to the following offices/positions: president, vice president, secretary, treasurer, RHA delegate.

5.3.12 In addition to any of the sanctions listed in this section, members of the Corps of Cadets are subject to disciplinary action in accordance with *The Standard*.

## 6.     THE APPELLATE AUTHORITY'S DECISION

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **19** of **24**

6.1     Both a Complainant and a Respondent may appeal the DA's decision. The bases for appeal are limited to:

   (1) A procedural error or omission that significantly impacted the outcome;
   (2) New evidence, unknown or unavailable during the investigation that could have significantly impacted the outcome; or
   (3) The appropriateness or severity of the sanctions[4].

6.2     All appeals must be in writing and must include a statement outlining the bases for appeal and any evidence which supports the appeal. Appeals must be filed within five (5) business days of the Complainant and Respondent's receipt[5] of the notice of the decision to be appealed. An appeal is filed when CREI receives a copy of a written appeal at civilrights@tamu.edu.

   If 1) no appeal is filed within five (5) business days of the receipt of the notice of the DA's decision; or, 2) CREI determines that the appeal does not identify one of the bases for appeal listed in *Section 6.1* above or provide credible information or evidence substantiating the identified bases for appeal, CREI will provide simultaneous notice to the parties that no valid appeal was filed and that the decision of the DA is final and the case is closed.  If a timely and valid appeal is filed by either party, the other party will be notified as soon as practicable thereafter.

6.3     CREI will forward the appeal and any supporting information or evidence to the appropriate Appellate Authority (AA). The AA, in consultation with OGC, will review the appeal documents, the decision of the DA, any new evidence submitted by the parties, and the Investigation Report and exhibits.  The AA will render a written decision which includes a rationale for the decision as to each of the grounds appealed. The AA will forward the appellate decision to CREI within ten (10) business days from the date of receipt of the appeal, unless circumstances require additional time. The decision of the AA will be final.

   Within five (5) business days after receiving the appellate decision, CREI will provide simultaneous notice of the AA's decision as set forth in *Section 4.7 above.*

6.4     The AA will render one or more of the following written decisions after reviewing a) the final investigative report, the documentary evidence and other relevant information; and b) the DA's decision on responsibility and/or sanctions:

   (1) **Affirm** the DA's decision on responsibility and/or the sanctions. There are no relevant issues of concern related to the ground(s) of the appeal, and, therefore, the decision is affirmed and final.

---

[4] If an employee was found to have sexually harassed another member of the university or agency community, 6.1(3) is not available as a basis for appeal.
[5] Complainants and Respondents are deemed to have received the Notice of the Decision on the day that the Notice is emailed to the party's University email account or to any other email account that was provided to CREI by the party.

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **20** of 24

(2) **Remand** the complaint back to the DA because new evidence which was unknown or unavailable during the investigation appears to be relevant and could have significantly affected the outcome of the decision on responsibility or the sanctions. The DA will instruct the IA to review the new evidence and amend the Investigative Report, as appropriate. The IA will submit the Amended Investigative Report, without conclusions, to the parties for review and response in accordance with *Section 3.15 and 3.16* and then to the DA for a new decision in accordance with *Section 4*. The new decision of the DA may be appealed by the parties in accordance with the procedures outlined in *Section 6.*

(3) **Remand** the complaint back to the DA with an instruction to correct the procedural error or omission.

If the procedural error occurred in the investigation phase, the DA will instruct the IA to correct the procedural error or omission and amend the Investigative Report, as appropriate. The IA will then submit the Amended Investigative Report, without conclusions, to the parties for review and response in accordance with *Sections 3.15 and 3.16*, and then to the DA for a new decision in accordance with *Section 4*.

If the procedural error occurred in the resolution phase, the DA will correct the procedural error or omission and then issue a new decision in accordance with *Section 4*.

The new decision of the DA may be appealed by the parties in accordance with Section 6 herein.

(4) **Modify**[6] the decision on sanctions because the sanctions given were inappropriate or disproportionate to the severity of the conduct after considering all the circumstances. The AA will impose new sanctions, which are final.

6.5     The appeal will be confined to a review of the record from the investigation and any pertinent evidence, as well as the DA's decision as related to the grounds for appeal. The appeal does not create an entitlement to a new investigation.

6.6     If an appeal is sought by both parties within the time frame specified in *Section 6.2*, the AA will review both appeals and will render decisions accordingly.

7.     MISCELLANEOUS PROVISIONS

7.1     A Respondent's voluntary intoxication is never an excuse for or a defense to Prohibited Conduct, and it does not diminish the Respondent's responsibility to determine that the other person has given consent and has the capacity to do so.

7.2     The University will make every reasonable effort to comply with the timelines contained in this procedure. However, extensions may be obtained by the IA, DA,

---

[6] If an employee was found to have sexually harassed another member of the university or agency community, the AA may not render a decision which MODIFIES the sanctions.

or AA, as appropriate under the circumstances. Circumstances that warrant an extension may include, but are not limited to:

- Temporary unavailability of the Complainant(s), Respondent(s) or witnesses;
- Delays in issuance and/or receipt of information to or from the IA;
- Temporary unavailability of the IA, DA, or AA due to illness, family needs or professional commitments;
- Holidays or other periods when the Complainant, Respondent, witnesses, or other University Employees may be unavailable; and/or
- New allegations, new evidence, new witnesses, or any other fact or circumstance that would require further investigation.

7.3     All requests for extensions must be justified in writing and shall be sent by the IA, DA, or AA to the Office of Risk, Ethics, and Compliance for review and approval by the Chief Risk, Ethics, and Compliance Officer or designee. CREI will simultaneously notify the Complainant and Respondent in writing of any extensions and the reason for the extensions.

7.4     The University's disclosure of information related to an investigation, the DA's decision and/or the sanctions rendered under this SAP will be governed by the provisions of the Family Educational Rights and Privacy Act (FERPA), the Texas Public Information Act (TPIA), the Texas Education Code Section 51.971, and other applicable confidentiality laws.

7.5     This SAP applies to all reports of Prohibited Conduct received by the University on or after the effective date of this SAP.

## 8.     INTERIM SUSPENSIONS AND INTERIM RESTRICTIONS OF STUDENTS

8.1     A student may not be expelled or suspended prior to a decision of responsibility for Prohibited Conduct or for other violations of university rules, policies, regulations, codes, or SAP except when the Dean of Student Life believes that an interim suspension should be imposed.

Interim suspension may be imposed only to ensure the safety and well-being of members of the University community or guest, or preservation of University property; to ensure the student's own physical or emotional safety and well-being; and/or if the student poses an ongoing threat of disruption of, or interference with, the normal operations of the University.

If the Dean of Student Life issues an interim suspension, a show cause hearing will be scheduled as soon thereafter as practicable. The student will be notified in writing of this action and the reasons for the interim suspension.  The notice will include the time, date, and place of a subsequent conference at which the student may show cause as to why his/her continued presence on the campus does not constitute a threat.  The student may also contest whether the facts of the initial report are accurate.

8.2    During the interim suspension, a student may be denied access to campus housing and/or the campus (including classes) and/or all other University activities or privileges for which the student might otherwise be eligible.

8.3    The interim suspension does not replace the investigation and resolution process. The investigation and resolution process shall proceed as outlined in this SAP, except that the timelines referenced in this SAP shall not be followed and the allegations will be resolved as soon as possible.

8.4    Interim restrictions include, but are not limited to, contact restrictions; representation of the university; and/or participation in university affiliated organization meetings, events, and/or activities.

Interim restrictions may be imposed (1) when a student has been interim suspended; (2) when a determination is made to implement a transcript hold under *Texas A&M System Regulation 11.99.02*; and/or (3) in instances when the student's participation or representation would threaten or negatively impact other students who are participating and/or representing an organization or the university. When interim restrictions are imposed, a student will be notified in writing of the specifics of the restrictions and why the restrictions are being implemented. Restrictions will remain in place through a designated time period and/or, if not indicated, until the student is notified that the restriction has ended.

9.    INTERIM ADMINISTRATIVE ACTIONS FOR EMPLOYEES

9.1    In accordance with University rules and SAPS, CREI may request that an employee be placed on leave during the investigation and resolution process.  CREI may also issue interim restrictions to an employee, which include, but are not limited to, contact restrictions; representation of the university; "no trespass" orders, etc.  Such interim actions will remain in place as specified in the Notice to the employee or until the allegations are resolved.

---

## Related Statutes Policies, Regulations, and Rules

System Policy 08.01 *Civil Rights Protections and Compliance*

System Regulation 08.01.01 *Civil Rights Compliance*

University Rule 08.01.01.M1 *Prohibited Conduct: Discrimination, Harassment, Complicity, and Related Retaliation based on a Protected Characteristic*

University Rule 12.01.99.M2 *University Statement on Academic Freedom, Responsibility, Tenure, and Promotion*

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **23** of **24**

Standard Administrative Procedure 12.99.99.M0.01 *Faculty Grievances Procedures not Concerning Questions of Tenure, Dismissal or Constitutional Rights*

System Regulation 32.02.02 *Discipline and Dismissal of Nonfaculty Employees*

System Regulation 32.01.02 *Complaint and Appeal Process for Nonfaculty Employees*

---

## Contact Office

---

**Department of Civil Rights and Equity Investigations**

08.01.01.M1.01 Investigation and Resolution of Allegations of Prohibited Conduct Against Students, Employees and Third Parties

Page **24** of **24**