United States District Court
Southern District of Texas
**ENTERED**
January 26, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-20-4332 |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Texas A&M University found that John Doe, a senior, sexually assaulted another student. The University suspended him for a year effective December 31, 2020, with permission to apply for readmission to complete his degree. John Doe moves for a preliminary injunction, arguing that A&M's adjudication of the complaint against him violated his due-process rights and discriminated against him as a male. The court heard argument and carefully reviewed the pleadings, motions, responses, and the record, including the transcript of the disciplinary hearing. Finding no basis to grant the extraordinary remedy of a preliminary injunction, the court denies the application for relief. The reasons are explained in detail below.

**I.    Background**

John Doe is a senior at Texas A&M University and a member of A&M's Corps of Cadets program. He was scheduled to graduate in August 2021. In March 2020, he went on a spring break trip to Gruene, Texas with other members of the Corps. By all accounts, the group went intending to drink heavily, and they did.

Jane Roe, also a senior, went on the same trip. She alleged that after a night of heavy drinking, John Doe led her into a bedroom, told her that she was pretty and that he had had a crush on her since freshman year, they kissed, and he sexually penetrated her. (Docket Entry No. 23-1

at 39:4–20). Roe alleged that she did not consent to the penetration and that her drunken state made her unable to consent. Doe claimed that he was so drunk that he was unable to remember what had happened, and, in any event, he would not have sexually assaulted anyone. (Docket Entry No. 23-1 at 218:1–2, 20–21).

Roe remembered more than Doe, but with gaps. She remembered Doe leading her to the bedroom, telling her about his crush on her, kissing her, and then there is a gap until she realized that she was lying face down, bent over the edge of the bed, with her jeans and underwear pulled down to her knees and Doe penetrating her from behind. (Docket Entry No. 23-1 at 39:4–20; Docket Entry No. 17-1 at 3).

Roe filed a complaint with A&M, alleging sexual assault, and pursued a formal charge against Doe in April 2020. (Docket Entry No. 1 at ¶33). Doe filed a report with A&M, also alleging sexual assault, but he did not pursue a formal sexual assault complaint until November 2020. (*Id.* at ¶34; Docket Entry Nos. 17-4, 17-5).

A&M completed a Title IX investigation of Roe's claim. The University's investigator interviewed Roe, Doe, and several other students who went on the trip, and prepared a report. (Docket Entry No. 1. at ¶¶42, 44). A&M then held a nearly six-hour Title IX hearing. Doe had retained a lawyer, who attended the hearing and cross-examined witnesses, primarily by asking questions submitted in advance. (Docket Entry No. 23-1). Roe had a University Title IX employee as an advisor. (*Id.*).

The hearing officer found Doe responsible for sexual assault and for conduct unbecoming a member of the Corps of Cadets. (Docket Entry No. 1 at ¶50). Doe received the lowest available sanction: (1) a one-year suspension to begin on December 31, 2020, until December 31, 2021, with eligibility to seek reenrollment in the University; (2) an indefinite mutual no-contact order between

the parties; (3) enrollment in and completion of the University's Ethic's & Decision Making Workshop; (4) a "reflective paper" of at least 700 words; and (5) attendance at the University's Alcohol Education Workshop. (*Id.* at ¶¶50–51).

Doe unsuccessfully appealed. (*Id*. at ¶¶52–53); (Docket Entry No. 17-3). He then filed this action, alleging Title IX and due-process violations and seeking a temporary restraining order and a preliminary injunction preventing his suspension from taking effect. (Docket Entry No. 1 at ¶¶56–100). A&M responded. (Docket Entry No. 17). The court held a hearing and, after considering counsels' arguments, denied Doe's motion for a temporary restraining order, finding that he had not shown either a likelihood of success on the merits or irreparable harm. (Docket Entry No. 20). The court asked the parties to submit the transcript of the Title IX hearing and additional briefing on the application for a preliminary injunction. (Docket Entry Nos. 20, 26, 29).

## II.     Preliminary Injunction Standard

A court may grant a temporary restraining order or preliminary injunction only if the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The party seeking injunctive relief must meet all four requirements. *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (quoting *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009)). "[A] preliminary injunction is an extraordinary remedy never awarded as of right," and it "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (quotation omitted).

**III.     Analysis**

Doe asserts that A&M did not provide him due process, violating the Fourteenth Amendment; that the defective proceeding resulted in an erroneous outcome, in violation of Title IX; and that A&M violated Title IX by selectively enforcing its disciplinary policy against male students. (Docket Entry No. 1 at ¶¶67–97). In his supplemental brief, Doe focuses on the Title IX erroneous-outcome claim. (Docket Entry No. 26).

**A.     Likelihood of Success on the Merits**

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). On the current record, Doe has not shown that he is likely to succeed on any of his three claims.

**1.     The Due-Process Claim**

Doe has not shown, and on this record cannot show, that he is likely to succeed on his due-process claim for a straightforward reason: this court lacks jurisdiction over the claim. "[S]uits against the States and their agencies . . . are barred regardless of the relief sought" by the Eleventh Amendment to the United States Constitution. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citing *Ex parte Young*, 209 U.S. 123 (1908); *Cory v. White*, 457 U.S. 85 (1982)). Texas A&M University is part of the State of Texas and subject to the same immunities. *See* Tex. Educ.Code § 86.02; *Self v. Texas A & M Univ.*, No. CIV.A. G-01-721, 2002 WL 32113753, at *4 (S.D. Tex. July 23, 2002). Texas has not waived its federal-court immunity from suit under § 1983. *Aguilar v. Tex. Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). Sovereign immunity "deprives a federal court of jurisdiction." *Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir. 1996).

In addition to the sovereign-immunity bar, Doe has failed to show that he is likely to succeed on the merits of this claim. Doe alleges a litany of errors, including that A&M did not conduct a full and impartial investigation, did not allow Doe to be fully represented by counsel, permitted hearsay at the hearing, limited Doe's counsel's ability to cross-examine witnesses, and relied on a preponderance-of-the-evidence standard, rather than a clear-and-convincing or a beyond-a-reasonable-doubt standard. (Docket Entry No. 1 at ¶75). None is persuasive.

A&M held a hearing that lasted nearly six hours. Doe was represented by counsel of his choice, who was present throughout the hearing. She cross-examined witnesses, and Doe testified in his own defense. A&M required the parties to submit questions for cross-examination for advance approval, but the record reflects that Doe's attorney participated fully at the hearing, and that the hearing officer permitted the attorney to ask nearly every question proposed on cross-examination, including questions not submitted in advance. (*See* Docket Entry No. 23-1).

The Fifth Circuit has found that similar university disciplinary proceedings, that applied a preponderance-of-the-evidence standard and similar limits to witness examination, met due-process requirements. *Plummer v. Univ. of Houston*, 860 F.3d 767, 771–72 (5th Cir. 2017), *as revised* (June 26, 2017). Doe is not likely to succeed in proving that A&M's process before and in the hearing denied him "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted).

### 2. The Erroneous-Outcome Claim

Title IX states that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is "enforceable through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).

A plaintiff must show that "the funding recipient engages in intentional conduct that violates the clear terms of the statute," for example by showing that a university's response to a sexual assault claim was "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642, 648 (1999); *see also Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204, 209–10 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 1268 (2020).

Doe alleges that the Department of Education and media pressure motivated Texas A&M to make an erroneous ruling finding Doe, a male, guilty of sexual assaulting a female student. (Docket Entry No. 1 at ¶¶ 78–85). To succeed on an erroneous-outcome claim, a plaintiff must show both that the disciplinary proceeding had an "erroneous outcome" and that "gender bias was a motivating factor behind the erroneous finding. *Klocke*, 938 F.3d at 210 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). "A plaintiff alleging an erroneous outcome must point to particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and "demonstrate a "causal connection between the flawed outcome and gender bias." *Id.* (quotation omitted). While the Fifth Circuit has not directly addressed the issue, other circuits have found that "clear procedural irregularities . . . will permit a plausible inference of sex discrimination." *Doe v. Oberlin*, 963 F.3d 580, 587 (6th Cir. 2020); (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019)).

Doe has not shown a likelihood of success on showing either a flawed outcome or a connection to gender bias. The record reflects that Doe received a full and fair hearing, with his counsel present throughout, with his counsel cross-examining witnesses, and with Doe making a closing statement. The record also supports the inference that Doe was the one who had sex with Roe the night of the party:

> COMPLAINANT: We were all hanging out in the living room together and John Doe pulled me aside from the group and led me into that bedroom that I was staying

6

> in. He locked the door behind me -- behind him and was asking general questions about how I was doing because he knew I'd been struggling with depression that semester. And this was normal for him because we were close friends. He then sat on the bed with me and began to tell me that I was very pretty and that he had always had a crush on me since Fish year. I remember saying, thank you, not being able to think anything bad of that at the time. The next thing that I remember was him kissing me and us now lying down on the bed. And my clothes were on at this point.
>
> After that, the next thing that I remember is me being face down on the edge of the bed with my jeans pulled down and him behind me penetrating my vagina with his penis without my consent. (Docket Entry No. 23-1 at 39:2–20).
> . . .
> COMPLAINANT: I know that he, John Doe , was in the room with me because during the eye contact, I remember seeing his blue eyes and blonde hair, and he is the only one there that looked even remotely close to that description. I also know it was him because when these memories play in my head, I can still hear his voice saying my name during the sexual assault. And he has a very distinct voice that is different from anyone else that was there that night. (*Id.* at 40:15 – 22).

The record also supports the inference that Roe was unable to, and did not, consent to the sexual penetration she described. Doe asserts that there was no evidence on consent because both he and Roe were so drunk that they did not remember what had occurred. (Docket Entry No. 26 at 2). That is not what the record reflects.

Roe testified that she did not believe that she would have consented to have sex with Doe if she were sober. (*See* Docket Entry No. 26 at 3). Doe testified that he did not remember but he did not believe that he would have committed sexual assault. (*Id.*). More importantly, while Doe testified that he remembered nothing, Roe testified that she remembered some, if not all, of the encounter, and that she did not consent:

> COMPLAINANT: . . . I think that my brain could kind of like note that that happened, but I wasn't able to fully understand what exactly had just happened until the next morning, just because of the intoxication and everything. (Docket Entry No. 23-1 at 68:1–5).
> . . .

7

> HEARING OFFICER PHIPPS: And I did not note anywhere in the statement that you indicated you tried to stop the Respondent from kissing you. Is that a fair statement?
> COMPLAINANT: Yes, ma'am. Again, I didn't fully—wasn't in the right, like, state to fully process what was going on in the moment. (*Id.* at 58:11–17).
> . . .
>
> COMPLAINANT: I do not believe that I fell asleep, but I definitely don't remember the time between – like those times that I don't recall between the Respondent kissing me and my pants being pulled down and the assault happening. I don't remember what had occurred during that time. (*Id.* at 59:15–20).
> . . .
>
> HEARING OFFICER PHIPPS: Can you tell us why you did not attempt to get up from the bed during the sex act?
> COMPLAINANT: I remember what was going through my mind, I just -- it was kind of going through my mind that I had kind of started to notice what was happening, but in that moment, I couldn't fully process like that it was like fully happening. Again, I was like very intoxicated, and so I just couldn't like connect the dots in my mind to like get up from this or to realize the full effect of what was actually happening. (*Id.* at 62:21 – 63:5)
> . . .
>
> COMPLAINANT: I was conscious during what was happening, but as far as like mentally being able to understand fully what was happening. Like I could physically feel what was happening, but I didn't have like the reaction or the ability to have the reactions that I normally would if I would have been sober in that moment.
> [JOHN DOE'S ATTORNEY]: Okay. When you say you hadn't been able to process, do you mean you hadn't yet been able to come to the realization that this was some sort of sexual activity without your consent?
> COMPLAINANT: Yeah. I think that's a better -- I'm sorry, I think that's a better way to put it, is like the realization of it, and like being able to fully like connect as to that physical feeling of what had happened and the realization of what had actually happened. Again, I could physically feel what he was doing, but that whole like mental realization of everything is what I couldn't like fully process, at that time. (*Id.* at 75:16 – 76:8)

Two other students who were on the trip testified that Roe told them a similar account of the sexual encounter with Doe the next day. One student, the only other woman on the trip, said that Roe told her that Doe led Roe to the bedroom, that Roe's pants were pulled down, that they "went all the way," and that Doe stopped only when someone knocked on the door. (Docket Entry No. 17-1 at 5). The other student testified that Roe told him that Doe locked the door to the room

and that "stuff transpired," including that her pants were moved down, and that Roe "[m]ade it clear that she was not okay with whatever did happen between her and [John Doe]". (*Id.* at 6; Docket Entry No. 23-1 at 201:17–18).

Doe argues that the fact that Roe's testimony that she viewed intoxication as being the same as incapacitation supports finding an erroneous outcome. (Docket Entry No. 26 at 4). Even if Roe's statements show a misunderstanding of when intoxication prevents the capacity to consent, that misunderstanding is irrelevant. It was the hearing officer, not Roe, who was responsible for applying the correct standard to the evidence. The University's Rule 08.01.01 defines "consent" as the "clear, voluntary and ongoing agreement to engage in a specific sexual act." (Docket Entry No. 1 at 33). Under that Rule, a "person who is asleep or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made under duress or by threat, coercion, or force cannot give consent." (*Id.*) The Rule describes "incapacitated" as "a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decisions about consent to sexual activity and recognizing the consequences of their decision." (*Id.* at 35).

> The hearing officer made clear that she was familiar with, and applied, Rule 08.01.01:
>
> [JOHN DOE'S ATTORNEY]: I don't think this question was on my list. But do you believe you were incapacitated on Friday night? Could you explain what you mean by incapacitated?
> [JOHN DOE'S ATTORNEY]: Ms. Phipps, is there an -- an actual definition in the A&M Rules that I am not recalling?
> HEARING OFFICER PHIPPS: There is a definition in the 08.01.01, but -- MS.
> [JOHN DOE'S ATTORNEY]: Okay.
> HEARING OFFICER PHIPPS: -- it's really up to me to determine, based on the evidence I hear whether or not the witness had the capacity to consent. Terry, let's don't go there. Let's just keep on.
> [JOHN DOE'S ATTORNEY]: Okay. So -- so you don't -- so you want to stop that question, right?

9

> HEARING OFFICER PHIPPS: No. I mean, I don't -- I -- she answered this -- what I'm looking for from the witness is whether or not she can describe what she was feeling, not -- and what she was -- what she was able to do. Because nobody when they're drunk is going to pull out 08.01.01 and say, look. What am I doing? (Docket Entry No. 23-1 at 92:4 – 93:1).

Doe alleges that he, at one point, requested that A&M's investigator "consult with a medical expert" about the effects of Doe's high blood alcohol content and his ability to perform the sexual act that Roe detailed. (Docket Entry No. 1 at ¶42, 44, 52). A&M's Rules provide that the investigator may consult with a medial expert "when expertise is needed in order to achieve an understanding of the issues under investigation." The Rule does not require the University to provide a medical expert on request. (Docket Entry No. 1 at 69–70). The record reflects that the appeal board considered Doe's request that the University provide a medical expert witness, explaining that "consultation with a medical expert would allow 'exploration' of your capacity, but still would not have provided definitive proof of your ability to do the things [alleged]. . . . [T]his would not likely have substantially altered the information available . . . [and it was therefore] unlikely this would have altered the outcome." (Docket Entry No. 1 at ¶54).

The final investigation report included information about both parties' blood-alcohol content and an analysis of its effects. (Docket Entry No. 17-1 at 8). The report describes Roe's estimated blood-alcohol content as .14%, "indicating her behavior to be drunk, emotional swings, slurred speech, nausea, loss of reaction time and motor control." (*Id.* (quotation omitted)). The report describes Doe's estimated blood-alcohol content of .232% as "indicating his behavior to be confused, nauseated, poor mentation, and blackout." (*Id.* (quotation omitted)).

A&M considered Doe's intoxication. A&M did not have an obligation to hire an independent medical expert. Doe does not explain how potential additional evidence about alcohol's physiological effects would have changed the available information or the outcome of

the investigation. Doe does not assert that he was prevented from providing his own medical expert opinion, and he does not argue that A&M's Title IX Rules prohibited him from doing so. Doe had retained counsel, but he did not submit a medical expert opinion for the University to consider. The absence of a medical expert does not support an inference of an erroneous outcome.

Courts have found a prima facie showing of an erroneous outcome in a university disciplinary proceeding when there were extensive delays in the disciplinary process and the hearing officer failed to acknowledge or account for contradictory evidence. *See Doe v. Oberlin College*, 963 F.3d 580, 586–87. COVID-19 did cause significant delays in the investigation of Doe's case. (Docket Entry No. 1 at ¶37). A&M's Rules provide that a draft report should issue within 30 business days of a notice of investigation. Rule 3.4 also provides that "[c]ircumstances may warrant extensions to this timeframe." (*Id.* at 70). Considering the Rule and the circumstances, the COVID-19-related delays do not show a procedural irregularity that supports finding an erroneous outcome. Rather, the record reflects that, under the novel circumstances of the pandemic, the A&M investigator used the time to interview Roe, Doe, and other witnesses. (Docket Entry No. 1 at ¶¶38–44).

Nor did the hearing officer fail to address contradictory testimony. Doe did not recall, and could not provide, evidence contradicting Roe's testimony. Doe testified that he did not remember anything sexual that had happened between him and Roe. He recalled nothing about going into a bedroom with her, kissing, having sex, or what happened after that. (*See* Docket Entry No. 26 at 2). He recalls only drinking and being drunk.

Doe argues that there was a possible alternate suspect because another male student who was on the trip had previously expressed romantic interest in Roe. On the current record, this theory does not provide a basis to find an erroneous outcome. Roe testified that she knew her

11

assailant was Doe based on his voice and his distinctive appearance, including his blond hair. The alternate suspect Doe identified is bald. (Docket Entry No. 23-1 at 116:21). The student witnesses who were present during the trip testified that Roe consistently described the alleged assault to them the next day, identifying Doe as the assailant.

The hearing officer's finding that Roe did not consent to sex with Doe, and that Doe committed sexual assault, does not reflect procedural irregularity or an erroneous outcome. The hearing officer exercised her discretion in weighing the evidence presented by both sides and the credibility of the parties and witnesses. The officer found by a preponderance of the evidence, a permissible standard, that Doe committed sexual assault.

Doe also argues that the fact that his appeal was decided within 24 hours of its submission supports finding an erroneous outcome. (*See* Docket Entry No. 1 at ¶53). The record reflects that the appeals panel issued a written decision addressing each of Doe's bases for appeal and providing reasons for its denial. (Docket Entry No. 17-3). No more is required. The time of the appeal panel's review, without any allegations of procedural defects, does not support an inference of erroneous outcome.

Nor has Doe shown that the disciplinary process or result was informed by gender bias. Doe initially chose not to formally pursue his cross-complaint until November 2020. (Docket Entry No. 17-5). While Doe asserts that the University "treated [the parties'] lack of memory differently on the basis of gender," (Docket Entry No. 26 at 1), Doe and Roe testified differently about their lack of memory. Doe testified that he did not remember anything at all; Roe testified that she remembered some of the events before the assault, remembered the assault itself, and remembered Doe as the assailant.

Doe makes general allegations that media pressure and Department of Education policies motivated the University to act "tough" on males that are accused of sexual assault. But Doe presents no evidence of discrimination against him in particular or against male students in general. *Cf. Oberlin Coll.*, 963 F.3d at 587 (an inference of discrimination was supported when the record reflected that 100 percent of sexual-assault complaints that went to a hearing resulted in a finding of responsibility on at least one charge).

Doe has not shown that he is likely to succeed on the merits.

### 3. The Selective-Enforcement Claim

Nor has Doe shown a likelihood of success on his selective-enforcement claim. "A selective enforcement claim needs to allege that either punishment or the decision to initiate enforcement proceedings was motivated by gender bias." *Klocke*, 938 F.3d at 213. Doe argues inequity because, while both students were drunk, he was punished for sexual assault while Roe was not. The record does not support the contention that this difference was the result of disparate treatment. Roe opted to pursue a formal complaint against Doe in April 2020. (Docket Entry No. 1 at ¶33). Doe initially chose not to do so, and his formal complaint is now under investigation. (Docket Entry No. 1 at ¶34; Docket Entry No. 17-5). Doe received the lowest possible sanction for sexual assault on the University's sanctioning matrix. (Docket Entry No. 1 at ¶18). He has not presented statistical or other evidence of gender bias, only general allegations with no underlying facts. *Cf. Oberlin Coll.*, 963 F.3d at 587; *Klocke*, 938 F.3d at 213 (analyzing a selective-enforcement claim based on statistical information). Doe has not shown that he is likely to succeed on his selective-enforcement claim.

### B. Irreparable Harm

13

In general, an injury is irreparable only if it cannot be remedied through money damages. *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983). "The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).

Doe alleges that he will suffer irreparable harm absent an injunction because he will be unable to complete the coursework he needs to graduate in August 2021, he will not be able to serve in leadership roles in the University in his last semesters or after graduation, he will at least temporarily lose his status as an A&M student, and he will suffer harm to his future educational and employment prospects. (*See* Docket Entry No. 4 at 6; Docket Entry No. 26 at 5). Many of these asserted harms are speculative. Doe may apply for readmission after the suspension period is over, and he will have a separate cause of action against the University if his application is denied. Many courts have found that similar harms are compensable in damages. *See Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, No. CV 20-1456, 2020 WL 5017665, at *4 (E.D. La. Aug. 25, 2020) ("Numerous courts have reached the same conclusion in . . . cases involving delayed education and potential reputational damage, finding that the delay was compensable and the reputational damage was compensable and/or speculative."); *Caiola v. Saddlemire*, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (rejecting the plaintiff's claim that stigma of expulsion could interfere with his career as "speculative" and noting that "[i]n order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries").

This court joins many other courts finding that a delay in education is not irreparable harm.[1] Doe will likely suffer educational delay and resulting harm while this case is adjudicated on the merits, but that harm is compensable in damages. Doe has not shown that he will suffer an irreparable injury warranting a preliminary injunction.

### C.     The Injury and the Public Interest

Finally, Doe has not shown that the injury to him from denying the injunction outweighs the harm to the University and the public interest if it is granted. Colleges and universities across the country have worked to craft and follow procedures for resolving student sexual-assault claims that comply with federal statutes and regulations, are fair to both sides, and further the institutions' educational missions. The record shows that A&M worked hard in this case to provide a

---

[1] *See, e.g.*, *Hodges*, 2020 WL 5017665, at *4 (collecting cases); *Doe v. Princeton Univ.*, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) (if the plaintiff prevails on the merits of his underlying claims and is reinstated to Princeton, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation); *Madej v. Yale Univ.*, 2020 WL 1614230, at *6–7 (D. Conn. Mar. 31, 2020) (academic withdrawal does not mean plaintiff will never be able to obtain his degree; rather, his ability to do so will be delayed, which can be remedied through monetary compensation; reputational harm assertions are "too speculative to warrant injunctive relief"); *Doe v. Vassar Coll.*, 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (finding no irreparable harm where the plaintiff claimed he would "lose the ability to play college soccer as well as his ability to graduate with his class this year"); *Montague v. Yale Univ.*, 2017 WL 4942772, at *3–4 (D. Conn. Mar. 8, 2017) (the harm from the plaintiff's delay in completing education, not graduating with contemporaries, and possibility of decreased employment opportunities are quantifiable and can be adequately remedied by money damages); *Knoch v. Univ. of Pittsburgh*, 2016 WL 4570755, at *8–9 (W.D. Pa. Aug. 31, 2016) (any interruption of education and delay in entering the workforce due to suspension can adequately be compensated by monetary damages should plaintiff succeed on the merits of his claims; it is speculative that plaintiff would lose any professional connections by virtue of his suspension); *Howe v. Pennsylvania State Univ. – Harrisburg*, 2016 WL 393717, at *6 (M.D. Pa. Feb. 2, 2016) *appeal dismissed* (Mar. 29, 2016) ("[T]he court finds that even if the plaintiff would experience a delay as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted."); *Pierre v. University of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("[C]ourts have also held that a suspension from school is not irreparable."); *Mahmood v. Nat'l Bd. of Med. Examiners*, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012) (collecting cases stating that delays in education services do not constitute irreparable harm); *Phillips v. Marsh*, 687 F. 2d 620 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [the plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages.").

15

procedurally and substantively fair hearing. Doe is harmed by the denial of the relief he seeks, but that harm does not outweigh the harm to the University and the public interest that would result from undermining the result of such a proceeding. Without minimizing the personal setbacks Doe will suffer, the court finds that they do not support relief.

## IV.    Conclusion

Because the court finds that John Doe has not met the requirements for the issuance of a preliminary injunction, his motion, (Docket Entry No. 4), is denied.

SIGNED on January 26, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge